# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-1071

_____

Marcus Mitchell

*Plaintiff - Appellant*

v.

Morton County Sheriff Kyle Kirchmeier; Morton County; City of Bismarck;
Morton County Sheriff's Deputy George Piehl; Bismarck Police Officer Tyler
Welk; North Dakota Highway Patrol Sergeant Benjamin Kennelly; John Does 1-2

*Defendants - Appellees*

------------------------------

Institute for Justice; National Congress of American Indians; Erwin Chemerinsky;
Tabatha Abu El-Haj; Genevieve Lakier; Lyrissa Lidsky, Dean; Kermit Roosevelt;
Amanda Shanor; Steven H. Shiffrin; Geoffrey Stone; Nadine Strossen; Laura
Weinrib; Howard University School of Law Civil Rights Clinic; Cato Institute

*Amici on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the District of North Dakota - Western

_____

Submitted: December 14, 2021
Filed: March 14, 2022

_____

Before SMITH, Chief Judge, GRUENDER and KOBES, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Alleging that law enforcement officials shot him with lead-filled bean bags while he was protesting, Marcus Mitchell sued Morton County and various North Dakota state officials under 42 U.S.C. § 1983 for violating his rights under the First, Fourth, and Fourteenth Amendments. The district court dismissed Mitchell's complaint with prejudice. Mitchell appeals, and we affirm in part and reverse in part.

**I.**

Mitchell's complaint alleged the following facts, which at this stage in the litigation we must assume are true. *See Kruger v. Nebraska*, 820 F.3d 295, 300-02 (8th Cir. 2016). In November 2016, Mitchell traveled to North Dakota to participate in protests against the construction of an oil pipeline across Native American tribal land. By that time, the protests had been ongoing for several months, and law enforcement was becoming "increasingly hostile and aggressive" toward the protestors despite the fact that they were protesting "peacefully." Under the direction of Morton County Sheriff Kyle Kirchmeier, the officers began to use "violent tactics" against the protestors, including deploying "weapons like bean bag pellets, rubber bullets, tear gas, pepper spray, and firehoses to spray freezing water."

On October 24, 2016, Sheriff "Kirchmeier and other officials from the state of North Dakota closed" a public highway in the vicinity of the protests and "maintained a reinforced barricade" there. Two days prior, "law enforcement officers under [Sheriff] Kirchmeier's command [had] fired rubber bullets and sprayed pepper spray" at the protestors, "causing numerous protesters to suffer injuries." Three days after the closure, law enforcement and the protestors clashed again. Officers used pepper spray and "shotguns loaded with sponge bullets and bean bags" against the protesters, "causing numerous injuries."

The unrest continued into November. On November 20 and 21, despite "wholly fail[ing] to provide adequate warnings or announcements to disperse," officers "indiscriminately deployed freezing water, chemical agents," and other weapons, "including lead-filled bean bags," at "individuals within the crowd." Many protestors "suffered serious injuries, including loss of consciousness, facial burns, broken bones, genital injury, and hypothermia as a result of the officers' actions." In particular, one individual "peacefully protesting" was hit by an explosive munition that "nearly sever[ed] her left hand from her arm, . . . destroying most of the arteries, skin, tissue, muscle, nerves, tendons, and bone in her left forearm."

Sheriff Kirchmeier "defended law enforcement's use of force, and specifically the use of impact munitions." "When we're put in the position of protected areas being overrun by numbers of people," he explained, "these are lawful tools to quell the advancement. . . . We're not just gonna let people and protesters in large groups come in and threaten officers." Under Sheriff Kirchmeier's direction, "law enforcement officers continually deployed" weapons such as "bean bag guns" against the protestors "throughout late 2016 and early 2017."

"On the evening of January 18, 2017, and into the early morning hours of January 19, 2017, approximately 200 [protestors] gathered" at a bridge "near the law enforcement blockade" on the public highway. The protest was "peaceful." Although it is unclear from the record whether the bridge was closed to pedestrian traffic, Mitchell concedes that it was closed at least to vehicular traffic. A team of officers led by Sergeant Benjamin Kennelly was "dispatched to the scene and issued 12 gauge shotguns that deployed drag stabilizing bean bag rounds." Sergeant Kennelly acted as "scene commander" and "directed law enforcement officers during 'pushes' during which officers rushed, advanced toward and deployed munitions at" the protestors.

Having "heard that law enforcement officers were shooting unarmed [protestors], including elders and women," Mitchell decided to go to the bridge. As

"Mitchell approached the Bridge, he observed from a distance that law enforcement officers were indeed shooting people on the Bridge." Mitchell "positioned himself in front of women and elders in the crowd" and, "[w]ith his hands raised in the air, . . . said 'Mni Wiconi,' which means 'water is life' in the Lakota language." After a countdown, several officers fired lead-filled bean bags from their shotguns at Mitchell. Mitchell was hit in three places, including his head. One of the rounds shattered his left eye socket and became lodged in his eye, requiring surgery.

Mitchell was arrested and charged with criminal trespass and obstruction of a government function. The case did not proceed to trial; instead, Mitchell and the state entered into a pretrial diversion agreement in which the state conditionally agreed to dismiss the charges. *See generally* N.D. R. Crim. P. 32.2 (governing pretrial diversion agreements in North Dakota).

Mitchell sued. He brought several claims under 42 U.S.C. § 1983 against various North Dakota officials in their individual capacities; a claim for liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), against Sheriff Kirchmeier in his official capacity as Sheriff of Morton County; and several state-law claims against various individual and municipal defendants. On the defendants' motion, the district court dismissed with prejudice Mitchell's complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6).

Mitchell appeals, challenging the decision to dismiss his complaint as well as the decision to dismiss it with prejudice without granting him leave to amend. The only claims that Mitchell meaningfully argues in his opening brief the district court should not have dismissed are (1) a § 1983 claim against the officers who allegedly shot him for retaliatory use of force in violation of his First Amendment rights, (2) a § 1983 claim against the officers who allegedly arrested him for retaliatory arrest in violation of his First Amendment rights, (3) a § 1983 claim against the officers who allegedly shot him for use of excessive force in violation of his Fourth Amendment rights, (4) a § 1983 claim against Sergeant Kennelly for failure to intervene to prevent the use of excessive force, (5) a § 1983 claim against the officers who

allegedly shot him for discrimination on the basis of "his status as an Indigenous person" in violation of the Equal Protection Clause of the Fourteenth Amendment, and (6) the *Monell* claim against Morton County insofar as this claim asserted municipal liability for the Fourth Amendment and Equal Protection Clause violations. Accordingly, we deem waived any challenge to the district court's dismissal of Mitchell's other claims. *See Chay-Velasquez v. Ashcroft*, 367 F.3d 751, 756 (8th Cir. 2004).

## II.

We review the grant of a motion to dismiss *de novo*. *Smith v. S. Farm Bureau Cas. Ins.*, 18 F.4th 976, 979 (8th Cir. 2021). A claim survives a Rule 12(b)(6) motion to dismiss only if the complaint's nonconclusory allegations, accepted as true, make it not just "conceivable" but "plausible" that the defendant is liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 680-83 (2009).

### A.

We begin with Mitchell's claims for retaliatory use of force and retaliatory arrest in violation of the First Amendment. The district court determined that both claims were barred by the rule announced in *Heck v. Humphrey*, 512 U.S. 477 (1994). In the alternative, the district court determined that even if *Heck* did not apply, the claims would be subject to dismissal under Rule 12(b)(6) on the merits. Although we conclude that *Heck* does not bar either claim, we agree with the district court that both claims are subject to dismissal under Rule 12(b)(6) on the merits.[1]

---

[1]There is some confusion about whether the *Heck* bar is jurisdictional. *E.g.*, *compare Dixon v. Hodges*, 887 F.3d 1235, 1237 (11th Cir. 2018) (per curiam) (stating that where *Heck* applies, it "strips a district court of jurisdiction"), *with Colvin v. LeBlanc*, 2 F.4th 494, 498-99 (5th Cir. 2021) (holding that "*Heck* does not present a jurisdictional hurdle"). To avoid deciding the question here, we explain why *Heck* does not apply before considering whether Mitchell's claims are subject to dismissal under Rule 12(b)(6) on the merits.

1.

In *Heck*, the Supreme Court held that a district court must dismiss a § 1983 claim if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the plaintiff proves "that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  512 U.S. at 487. Like other courts, we have labeled the requirement to prove that the conviction or sentence has already been invalidated the "favorable-termination" requirement. *See, e.g.*, *Entzi v. Redmann*, 485 F.3d 998, 1003 (8th Cir. 2007); *Wilson v. Johnson*, 535 F.3d 262, 263 (4th Cir. 2008).  Importantly, it is only if the plaintiff's § 1983 claim "would necessarily imply the invalidity of his *conviction or sentence*" that the favorable-termination requirement comes into play.  *See Heck*, 512 U.S. at 487 (emphasis added).

Here, Mitchell was never convicted of—and therefore, *a fortiori*, never sentenced on—the charges against him.  Furthermore, even if the pretrial diversion agreement were a "conviction or sentence," *see id.*, the success of Mitchell's § 1983 claims would not imply its invalidity.  In North Dakota, a pretrial diversion agreement is simply a contract in which the state agrees to forgo prosecution in consideration for the defendant agreeing not to "commit a felony, misdemeanor or infraction" for a specified period of time (and, in some cases, agreeing to further conditions).  N.D. R. Crim. P. 32.2(a)(1)-(2).  The success of Mitchell's § 1983 claims would imply nothing at all about whether his pretrial diversion agreement with the state was a valid contract.  Therefore, the favorable-termination requirement does not come into play, and Mitchell's § 1983 claims are not *Heck*-barred.  *See Vasquez Arroyo v. Starks*, 589 F.3d 1091, 1095 (10th Cir. 2009) (holding that *Heck* does not apply to pretrial diversion agreements because "there is no related underlying conviction"); *McClish v. Nugent*, 483 F.3d 1231, 1251 (11th Cir. 2007) (holding that *Heck* does not apply to pretrial intervention agreements, regardless of

-6-

whether such an agreement "amount[s] to a favorable termination," because the § 1983 plaintiff "was never convicted of any crime" (emphasis omitted)).

The district court reached a contrary conclusion by misreading *Heck*. According to the district court, *Heck* bars any § 1983 claim whose success would imply the plaintiff's innocence of charges in a criminal proceeding unless the plaintiff can prove that the proceeding was terminated favorably to him. On this reading, the mere existence of a criminal *charge* incompatible with the plaintiff's § 1983 claim triggers the favorable-termination requirement. But that is not what the Court said in *Heck*, 512 U.S. at 487 (barring only § 1983 claims whose success would imply the invalidity of the plaintiff's "conviction or sentence"), and it conflicts with what the Court has consistently held since, *see, e.g.*, *Wallace v. Kato*, 549 U.S. 384, 393 (2007) (denying that *Heck* applied where "there was in existence no criminal conviction that the [§ 1983] cause of action would impugn"). We recognize that the Third Circuit has adopted a reading of *Heck* like the district court's. *See Gilles v. Davis*, 427 F.3d 197, 208-12 (3d Cir. 2005). For the reasons explained above, however, we find the cases from the Tenth and Eleventh Circuits that reject this reading more persuasive. *See Vasquez Arroyo*, 589 F.3d at 1095; *McClish*, 483 F.3d at 1251.

2.

Although Mitchell's First Amendment retaliation claims are not *Heck* barred, we agree with the district court that they are subject to dismissal under Rule 12(b)(6) on the merits. As relevant here, to prevail on a First Amendment retaliation claim, the plaintiff must show that the defendant would not have taken the adverse action but for harboring "retaliatory animus" against the plaintiff because of his exercise of his First Amendment rights. *Nieves v. Bartlett*, 587 U.S. ---, 139 S. Ct. 1715, 1722 (2019). It is not enough for the plaintiff to show that the defendant arrested or used force against the plaintiff in response to conduct that in fact was protected. *See Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (2010). If the response was driven not by "animus" but by the defendant's understanding—however mistaken—

of his official duties, then it was not "retaliatory." *See id.* (affirming summary judgment for the defendants on a First Amendment retaliatory-arrest claim because the defendants arrested the plaintiffs based on a genuine albeit "unreasonable" belief that the plaintiffs' protest conduct violated the law).

Here, the nonconclusory allegations in the complaint do not give rise to a plausible inference that the officers who allegedly shot and arrested Mitchell acted out of retaliatory animus. According to the complaint, hundreds of protestors had gathered in the middle of the night on a bridge that Mitchell concedes was closed at least to vehicular traffic and was "near [a] law enforcement blockade." Sheriff Kirchmeier was concerned that the protestors were occupying a "protected area[]," and the officers initiated "pushes" in an effort to move the protestors. It was only after Mitchell stood in their way and ignored a countdown warning that the officers shot him with the bean bags and arrested him.

The only plausible inference to draw from these allegations is that the officials' response to Mitchell's presence on the bridge was driven by their understanding of their responsibilities as officials charged with maintaining law and order. *Cf. Thayer v. Chiczewski*, 705 F.3d 237, 249, 253-54 (7th Cir. 2012) (finding no evidence of retaliatory animus when officers arrested a protestor who failed to comply with a dispersal order, regardless of whether the officers had probable cause). To be sure, it is "conceivable" that the officers were pursuing a personal vendetta against Mitchell because of the content of his speech or the people with whom he chose to assemble. *See Iqbal*, 556 U.S. at 680. But it is not "plausible." *See id.*

Indeed, conclusory allegations aside, the complaint alleged no facts that even hint at a retaliatory motive. Mitchell emphasizes the allegation that he had announced in Lakota that "water is life" shortly before the officers shot him, but his own allegations indicate that the officers had begun shooting bean bags at the protestors before he arrived at the scene. Shooting bean bags at Mitchell too after he stood in their way is exactly what one would expect the officers to do even if

Mitchell had said nothing. So, the fact that Mitchell made his statement shortly before the officers shot him does not make it plausible that the statement was a but-for motivating cause of the officers' use of force. *See Nieves*, 139 S. Ct. at 1722.

Furthermore, the timing and location of the gathering—the fact that it occurred in the middle of the night near a law enforcement blockade on a bridge closed at least to vehicular traffic—bolsters the alternative, "non-retaliatory explanation" that the officers were simply trying to maintain law and order. *See Kilpatrick v. King*, 499 F.3d 759, 768 (8th Cir. 2007). So does the fact that Mitchell was given a countdown, which suggests that the officers were motivated by Mitchell's refusal to move rather than his speech. *Cf. Auer v. City of Minot*, 896 F.3d 854, 860-61 (8th Cir. 2018) (concluding that no reasonable jury could infer retaliatory animus from the fact that the adverse action "happened shortly after" the protected conduct given that an intervening event "even closer in time" provided a nonretaliatory basis for the adverse action).

In sum, "[a]s between th[e] 'obvious alternative explanation'" that the officers were simply trying to maintain law and order and the retaliatory animus that Mitchell "asks us to infer," retaliatory animus "is not a plausible conclusion." *See Iqbal*, 556 U.S. at 682 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)); *Graham v. Barnette*, 5 F.4th 872, 889 (8th Cir. 2021) ("[T]hough the temporal proximity of [the plaintiff's] protected activity and [the adverse action] is relevant, it is not enough on its own to create a triable issue of fact regarding cause where no other record evidence supports finding a retaliatory motive and there is evidence that the officers acted in good faith."). The district court properly dismissed Mitchell's First Amendment retaliation claims.

We emphasize that this reasoning is neutral as to whether the First Amendment protected Mitchell's right to assemble and speak on the bridge. Thus, we need not address the argument pressed by Mitchell and *amici* First Amendment scholars that if the complaint's allegations are true, then the bridge closure violated the First Amendment. Officers merely carrying out their duty as they understand it

are not liable for retaliatory arrest or retaliatory use of force even if their understanding of their duty is mistaken—indeed, even if it is so mistaken as to be "unreasonable." *Baribeau*, 596 F.3d at 481. To be sure, they may be liable for unlawful arrest or use of excessive force. *See id.*; *infra* Section II.B. But constitutional torts of retaliation require acting on retaliatory animus. *See Nieves*, 139 S. Ct. at 1722; *Baribeau*, 596 F.3d at 481; *Kilpatrick*, 499 F.3d at 767; *Thayer*, 705 F.3d at 253. Here, Mitchell failed to plead facts that make an inference of retaliatory animus plausible. Therefore, his claims for retaliatory arrest and retaliatory use of force were subject to dismissal even assuming the First Amendment protected his right to assemble and speak on the bridge.

B.

Next, Mitchell challenges the dismissal of his claims that the officers who allegedly shot him violated the Fourth Amendment by using excessive force against him and that not only they but also Morton County and Sergeant Kennelly are liable for this violation.

1.

To decide whether the force used to seize a suspect was excessive and thus "unreasonable" for purposes of the Fourth Amendment, we look to "the totality of the circumstances." *Tennessee v. Garner*, 471 U.S. 1, 8-9, 11 (1985). Relevant factors include (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Applying these factors, we have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him. *See, e.g.*, *Jackson v. Stair*, 944 F.3d 704, 713 (8th Cir. 2019); *Div. of Emp. Sec. v. Bd. of Police Comm'rs*, 864 F.3d 974, 978-79 (8th Cir. 2017); *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013); *Montoya*

*v. City of Flandreau*, 669 F.3d 867, 872-73 (8th Cir. 2012); *Shannon v. Koehler*, 616 F.3d 855, 862-63 (8th Cir. 2010).

Here, the complaint did not suggest that Mitchell was suspected of anything more than trespassing and obstructing a government function, both nonviolent misdemeanors. *See* N.D. Cent. Code §§ 12.1-22-03, 12.1-08-01. Nor did the complaint suggest that Mitchell threatened anyone or fled or resisted arrest; on the contrary, it alleged that he simply stood with his hands above his head. It is "clearly established" that the use of more than *de minimis* force in circumstances like these violates the Fourth Amendment. *Jackson*, 944 F.3d at 713; *Div. of Emp. Sec.*, 864 F.3d at 978-79; *Montoya*, 669 F.3d at 871-73; *Shannon*, 616 F.3d at 862-64.

Nonetheless, according to the complaint, the officers shot Mitchell with shotgun-propelled, lead-filled bean bags that shattered his eye socket. Our cases clearly establish that gentler treatment than this constitutes more than *de minimis* force. *See, e.g.*, *Small*, 708 F.3d at 1005-06 (holding that it was clearly established that tackling from behind without warning constitutes more than *de minimis* force); *Montoya*, 669 F.3d at 870, 872-73 (holding that it was clearly established that causing a person to trip by "sweeping her . . . leg" constitutes more than *de minimis* force); *Shannon*, 616 F.3d at 858, 863-64 (holding that it was clearly established that a takedown constitutes more than *de minimis* force). True, the complaint did not allege that the officers were aiming at Mitchell's face. But it did allege that the officers were aiming at Mitchell. And the severity of Mitchell's injuries confirms what any "reasonable officer in [the defendants'] position" would have known: to fire a shotgun loaded with a lead-filled bean bag at a person, regardless of whether one is aiming at the person's face, is to use more than *de minimis* force against the person. *See Montoya*, 669 F.3d at 872 (explaining that "the severity of the injuries [the plaintiff] sustained is a relevant factor in determining the reasonableness of the force used").

Therefore, assuming the nonconclusory allegations in the complaint are true, the officers who shot Mitchell violated his Fourth Amendment rights. Furthermore,

because it was clearly established that the alleged conduct violated Mitchell's Fourth Amendment rights, we must assume at this stage in the litigation that the officers who allegedly shot Mitchell are not entitled to qualified immunity. *See Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018). The district court erred in dismissing Mitchell's Fourth Amendment claim against the officers who allegedly shot him.

The defendants maintain that our decision in *Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012), compels a different conclusion. It does not. The plaintiffs in *Bernini* alleged that they were protesting "peacefully . . . on the sidewalks" when, without provocation, police officers "began shooting chemical irritant canisters, plastic bullets, and concussion grenades at [them]." Amended Complaint at 15, *Bernini*, 665 F.3d 997 (No. 09-2312 PAM/JJG), 2009 WL 4563648. The district court did not dismiss the plaintiffs' excessive-force claims under Rule 12(b)(6). Instead, the case proceeded to discovery. *See* Order Extending Scheduling Order Deadlines, *Bernini*, 665 F.3d 997 (No. 09-2312 PAM/JJG), ECF No. 33 (resetting discovery deadline). It was not until discovery revealed that the officers used force because "a large and potentially riotous group" was advancing against a police barricade "in a threatening manner" despite repeated warnings to "back up" that the district court granted summary judgment for the defendants based on qualified immunity, which we affirmed. *Bernini*, 665 F.3d at 1001-04, 1006-07; *see also Baude v. Leyshock*, 23 F.4th 1065, 1072-73 (8th Cir. 2022) (distinguishing what the plaintiff alleged in support of his unreasonable-seizure claim from what the evidence showed "at the summary judgment stage" in *Bernini*).

So too here, Mitchell's allegations that he was "peacefully protesting"— neither committing a serious crime nor threatening anyone's safety nor fleeing or resisting arrest—when the officers shot him with lead-filled bean bags capable of shattering his eye socket are sufficient to state a claim for excessive force. Unless and until discovery tells a different story, the officers are not entitled to qualified immunity.

2.

Citing *Monell*, Mitchell argues that Morton County is liable for the violation of his Fourth Amendment rights. "A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an 'action pursuant to official municipal policy' or misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a "custom or usage" with the force of law.'" *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998) (quoting *Monell*, 436 U.S. at 691). To show a "custom or usage," the plaintiff must prove (1) "[t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees"; (2) "[d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct"; and (3) an "injury by acts pursuant to the governmental entity's custom." *Id.* (brackets omitted).

Here, the complaint alleged that Morton County law enforcement engaged in a persistent pattern of unconstitutional conduct. "Despite the fact that the [protestors] were peacefully protesting," the complaint stated, "law enforcement officers continually deployed" weapons such as "bean bag guns" at protestors "throughout late 2016 and early 2017." The complaint specifically discussed four dates, two in October 2016 and two in November 2016, on which this occurred. It alleged that, on one of these occasions, an "explosive munition . . . nearly sever[ed] a protestor's] left hand from her arm, . . . destroying most of the arteries, skin, tissue, muscle, nerves, tendons, and bone in her left forearm." The complaint alleged that this occurred even though the individual was "peacefully protesting" and the "officers wholly failed to provide adequate warnings or announcements to disperse." Taken together, these allegations indicate a pattern of Morton County law enforcement using excessive force against the protestors. *Cf. id.* at 881 (upholding a jury finding that "a pattern of unconstitutional conduct existed" based on evidence of misconduct that spanned several months).

The complaint also alleged that Sheriff Kirchmeier, a policymaking official in Morton County for purposes of "law enforcement practices," *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 n.12 (1986), tacitly authorized this use of excessive force. According to the complaint, Sheriff Kirchmeier "defended law enforcement's use of force, and specifically the use of impact munitions," calling them "lawful tools to quell the [protestors'] advancement." The complaint also alleged that Sheriff Kirchmeier "justified tactics . . . such as spraying protesters with water cannons, despite freezing cold temperatures, arguing, 'We're not just gonna let people and protesters in large groups come in and threaten officers.'" True, the complaint did not allege that Sheriff Kirchmeier explicitly authorized the use of these tactics against peaceful protestors. But it did allege that the protestors were peaceful. And if, as the complaint alleged, Sheriff Kirchmeier had been supervising law enforcement's response to the protests since they began, then he "must have been aware" that they were peaceful. *See Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 298 (2d Cir. 2020). Defending the use of "impact munitions" and "water cannons" in these circumstances amounts to tacitly authorizing the use of excessive force. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1025 (9th Cir. 2008) (holding that a jury could infer tacit authorization from evidence that the relevant policymaking official and others "following [his] lead" "expressed confidence in" and "resist[ed]" criticism of a subordinate despite clear indications that the subordinate was engaged in constitutional violations); *cf. Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (explaining that a municipality can be liable under *Monell* if its "officials ignored police misconduct"); *Lucente*, 980 F.3d at 297-98 (holding that "tolerant awareness" of constitutional violations can give rise to *Monell* liability); *Jeffes v. Barnes*, 208 F.3d 49, 61, 64 (2d Cir. 2000) (holding that a jury could find a municipality liable under *Monell* in light of evidence that the relevant policymaking official "was well aware of the existence" of constitutional violations but "fail[ed] to make any effort to forestall, halt, or redress [them]").

Finally, the complaint alleged that acts pursuant to Morton County law enforcement's pattern of unconstitutional conduct caused Mitchell's injury. The complaint explained that, in the months leading up to Mitchell's injury, officers

"indiscriminately deployed . . . lead-filled bean bags like the munitions Mr. Mitchell was harmed by" at peaceful protestors. Assuming the complaint's allegations are true, Mitchell's injury was caused by acts pursuant to Morton County law enforcement's pattern of using excessive force against the protestors. *Cf. Ware*, 150 F.3d at 884-85 (concluding that the jury could find a causal link between the municipality's "failure to address [past instances of similar] misconduct" and the subsequent violation of the plaintiff's constitutional rights).

In sum, Mitchell has stated a claim for municipal liability under *Monell*. If the allegations in his complaint are true, then Morton County law enforcement engaged in a persistent pattern of excessive force against peaceful protestors that was tacitly authorized by Sheriff Kirchmeier and that led to Mitchell's injury. The district court erred in dismissing Mitchell's *Monell* claim against Morton County insofar as the claim asserted liability for the alleged violation of his Fourth Amendment rights.

3.

According to Mitchell, Sergeant Kennelly is also liable for the violation of Mitchell's Fourth Amendment rights because he failed to intervene. "[A] police officer may be liable if he does not intervene to prevent the use of excessive force when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Robinson v. Payton*, 791 F.3d 824, 829 (8th Cir. 2015).

Here, the complaint alleged that Sergeant Kennelly and the other officers were "dispatched to the scene and issued 12 gauge shotguns that deployed drag stabilizing bean bag rounds" and that Sergeant Kennelly acted as "scene commander" and "directed" the other officers as they "deployed munitions" at the protestors. Although the complaint did not allege that Sergeant Kennelly was in the immediate vicinity when the officers shot Mitchell, it did indicate that the officers had been

firing lead-filled bean bags at the protestors for some time before they shot Mitchell. Specifically, the complaint alleged that Mitchell went to the bridge after he heard that the officers were shooting unarmed participants in a "peaceful protest" and that, as he approached, "he observed from a distance that law enforcement officers were indeed shooting people."

These allegations make it plausible that, having observed and indeed "directed" the use of the bean bags prior to Mitchell's arrival, Sergeant Kennelly had reason to know that the officers would continue to deploy them after Mitchell arrived. *See Baude*, 23 F.4th at 1074 (allowing a failure-to-intervene claim to proceed based in part on allegations "that the supervisors issued orders allowing their subordinates to use excessive force against an allegedly peaceful crowd"); *cf. Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009) (holding that an officer may be liable for "failure to take action to deescalate the situation" prior to the use of excessive force that forms the basis of the plaintiff's claim). They also make it plausible that, as "scene commander," Sergeant Kennelly had the opportunity and means to stop the use of the bean bags before Mitchell arrived. *Cf. Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009) (holding that five minutes was "a period which a jury could find sufficient to afford the onlooking officers an opportunity to intervene"); *Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008) (holding that a period of at least three minutes was sufficient to afford a supervisor an opportunity to intervene). Thus, the complaint's allegations make it plausible that both conditions for liability are met. *See Robinson*, 791 F.3d at 829.

Furthermore, it was clearly established that the force allegedly used was excessive, *see supra* Section II.B.1, and that supervising officers with the opportunity and means to prevent the use of excessive force have a duty to do so, *see, e.g.*, *Robinson*, 791 F.3d at 829. Therefore, we cannot say at this stage in the litigation that Sergeant Kennelly is entitled to qualified immunity. *See Stanley*, 899 F.3d at 627. The district court erred in dismissing Mitchell's claim against Sergeant Kennelly for failure to intervene.

C.

Finally, Mitchell challenges the dismissal of his claims that the officers who allegedly shot him targeted him because he is Native American, thereby violating the Equal Protection Clause, and that not only they but also Morton County is liable for this violation. To prove that the officers who allegedly shot him violated the Equal Protection Clause, Mitchell would need to show that they treated people who were not Native Americans but were otherwise similarly situated to him more favorably than him. *See Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 959-60 (8th Cir. 2019) ("The first step in an equal protection case is determining whether the plaintiff has demonstrated that she was treated differently than others who were similarly situated to her. Absent this threshold showing, [the plaintiff] does not have a viable equal protection claim." (internal quotation marks, brackets, and citation omitted)).

Mitchell failed to allege facts showing that otherwise similarly situated non-Native Americans were treated more favorably than he was. His complaint did feature the vague and conclusory allegation that the defendants "have a history of discriminating against and racially profiling individuals in Indigenous communities." But it did not allege, for example, that the defendants treated any non-Native American participants in the protest more favorably than Mitchell. On appeal, Mitchell claims that the appropriate comparator is "a non-Indigenous participant in a different protest—one that did not have to do with Indigenous rights." But Mitchell has not identified any actual such participant and alleged that this participant was treated more favorably than he was despite being otherwise similarly situated to him. Instead, Mitchell simply assumes, based on his general allegations of a history of anti-Indigenous discrimination, that the defendants would treat a hypothetical similarly situated non-Native American protestor differently. That Mitchell assumes this does not make it plausible. *See Iqbal*, 556 U.S. at 680-83 (holding that "bare assertions" of discrimination on the basis of "religion, race, and/or national origin" are insufficient to state a "constitutional discrimination claim"); *Walker v. Nelson*, 863 F. Supp. 1059, 1065 (D. Neb. 1994) ("[A]n equal

-17-

protection violation cannot be founded on theoretical possibilities."), *aff'd*, 70 F.3d 1276 (8th Cir. 1995) (unpublished).

Because Mitchell failed to allege facts making it plausible that the officers who allegedly shot him violated the Equal Protection Clause, the district court properly dismissed Mitchell's equal-protection claim against these officers. And because a *Monell* claim requires an underlying constitutional violation, the district court also properly dismissed Mitchell's *Monell* claim against Morton County insofar as this claim asserted liability for the alleged Equal Protection Clause violation. *See Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018).

## III.

After arguing that he pleaded sufficient factual matter to withstand a Rule 12(b)(6) motion to dismiss, Mitchell briefly argues in the alternative that even if he did not, the district court should have granted him leave to amend rather than dismissing with prejudice. We review the decision to dismiss with prejudice without granting leave to amend for an abuse of discretion. *Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 758 (8th Cir. 2021).

"Leave to amend generally is inappropriate . . . where the plaintiff has not indicated how [he] would make the complaint viable, either by submitting a proposed amendment or indicating somewhere in [his] court filings what an amended complaint would have contained." *Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 782 (8th Cir. 2009). Here, "[t]he record does not indicate that [Mitchell] has ever submitted a proposed amended complaint or clarified what one might have contained." *See id.* Therefore, setting aside the claims that the district court should not have dismissed at all, *see supra* Section II.B, the district court did not abuse its discretion in dismissing the complaint with prejudice without giving Mitchell an opportunity to amend, *see Pet Quarters*, 559 F.3d at 782; *cf.* Steven S. Gensler & Lumen N. Mulligan, *1 Federal Rules of Civil Procedure, Rules and Commentary*, Rule 12 cmt. (2021) (observing that when "the plaintiff has

failed to state a claim upon which relief may be granted, . . . courts tend to dismiss with prejudice precisely because the motion reaches the merits of the claim").

## IV.

For the foregoing reasons, we reverse the dismissal of (1) Mitchell's claim against the officers who allegedly shot him for use of excessive force, (2) Mitchell's *Monell* claim against Morton County insofar as this claim asserted liability for the use of excessive force, and (3) Mitchell's failure-to-intervene claim against Sergeant Kennelly insofar as this claim asserted liability for the use of excessive force; we affirm the dismissal with prejudice of the remainder of Mitchell's claims; and we remand for further proceedings consistent with this opinion.

_____