# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-2795

_____

Joshua Hollamon

*Plaintiff - Appellant*

v.

Pennington County

*Defendant*

County of Wright; Dustin Miller, in his official and individual capacities

*Defendants - Appellees*

------------------------------

American Civil Liberties Union of Minnesota

*Amicus on Behalf of Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: May 13, 2025
Filed: March 17, 2026

_____

Before BENTON, KELLY, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Joshua Hollamon alleges Sergeant Dustin Miller violated his Fourth Amendment right to be free from unreasonable seizure by excessive force when Sergeant Miller shot him with pepperballs while Hollamon and other protesters sought to disrupt the construction of a pipeline. The district court[1] granted summary judgment for Sergeant Miller on Hollamon's 42 U.S.C. § 1983 claim, determining Sergeant Miller did not violate the Constitution and that he was entitled to qualified immunity even if he did. Hollamon appeals. We affirm.

## I. Background

This case involves protests against the construction of a pipeline in northern Minnesota during the summer of 2021. During the evening of July 29, 2021, protesters shut down work at the construction site for several hours by locking themselves to a vehicle at the entrance gate. This orchestrated disturbance kicked off the protesters' plan to breach the construction site. Minutes later, Joshua Hollamon and several dozen protesters enacted a plan to breach the barriers surrounding the construction site away from the entrance gate.

Two fences separated from each other by a "No Man's Land" surrounded the construction site. The fences were topped with barbed wire and had "No Trespassing" signs on them. The No Man's Land had a raised mound or berm in the center, which sloped downward on each side toward both the inner and outer fences. Hollamon, who dressed in camouflage and wore a mask and goggles, helped a group of protesters erect ladders and climb over the outer fence to enter the No Man's Land. Officers shouted at the protesters not to cross and warned them that they would be trespassing if they came over the fence. Eventually, the group cleared the outer fence and entered the No Man's Land.

---

[1]The Honorable Katherine M. Menendez, United States District Judge for the District of Minnesota.

While the protesters were climbing over the outer barbed wire fence, Sergeant Miller and another officer fired pepperballs at them. The "PAVA" pepperball rounds released an irritant white powder, designed to affect the person struck by them through the release of the chemicals inside the round on impact and through the impact itself. Hollamon alleges the pepperballs fired by Sergeant Miller struck him several times, including his head. From a distance, officers video-recorded the incident. As described by the district court, "Plumes of white powder can be seen around the top of the ladders, but the video does not clearly show whether or where any pepperball may have struck Mr. Hollamon at that point." Hollamon claims one round hit his goggles after he jumped down from the ladder and two others hit his head while he was in the No Man's Land. He and others then crouched behind the berm and shielded themselves from the pepperballs.

About four minutes after the protesters began coming over the outer fence, officers were instructed to stop deploying munitions unless the protesters attempted to breach the inner fence. Sergeant Miller eventually stopped firing rounds after the message was relayed, and he switched to using canisters of chemical spray. The protesters, meanwhile, slowly moved toward the inner fence. Some protesters eventually attempted to scale it, but officers deployed chemical spray and tore away the blankets used by the protesters as shields. Hollamon advanced to the inner fence and assisted others trying to breach it by stabilizing a ladder.

Eventually, Hollamon and others retreated from the inner fence. Some left the No Man's Land while others, including Hollamon, regrouped. Approximately forty minutes after officers thwarted the initial advance on the inner fence, the protesters remaining in the No Man's Land tried to scale the inner fence again. This time, four individuals crossed the inner fence and were immediately taken into custody. After the fourth protester crossed the inner fence, several officers arrived inside the No Man's Land from a different direction and began arresting the protesters remaining there. As one officer attempted to arrest Hollamon, he fled up the berm before several other officers grabbed and arrested him. Hollamon was charged with two misdemeanors: trespassing and obstructing the legal process.

Hollamon sued Sergeant Miller and the County of Wright asserting a Fourth Amendment excessive force claim and other state common law claims for assault and battery. The defendants moved for summary judgment. The district court granted their motion in part, determining Sergeant Miller did not seize Hollamon and, that even if there was a seizure, he was entitled to qualified immunity. The court declined to exercise supplemental jurisdiction over the remaining state law claims. Hollamon appeals, arguing Sergeant Miller violated clearly established law by using excessive force against him in violation of the Fourth Amendment.

## II. Analysis

We review de novo a district court's grant of summary judgment based on qualified immunity. *De Mian v. City of St. Louis*, 86 F.4th 1179, 1182 (8th Cir. 2023). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, shows no genuine issue of material fact exists and the defendants are entitled to judgment as a matter of law. *Laney v. City of St. Louis*, 56 F.4th 1153, 1155 (8th Cir. 2023). To overcome qualified immunity, Hollamon "must show that the officer[] violated a constitutional right, and that the unlawfulness of [his] conduct was clearly established at the time." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1255 (8th Cir. 2023). "For a right to be clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. This right includes protection against unreasonable seizures involving the use of excessive force. *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Burbridge v. City of St. Louis*, 2 F.4th 774, 780 (8th Cir. 2021). To establish an excessive force claim under the Fourth Amendment, "the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *McCoy v. City of Monticello*, 342 F.3d 842, 846–47 (8th Cir. 2003). We assume,

without deciding, that a seizure occurred, and we resolve this case by answering whether Sergeant Miller's use of force was reasonable.

We evaluate the use of force based on an objective reasonableness standard, undertaking "a fact-intensive inquiry." *McDaniel v. Neal*, 44 F.4th 1085, 1090–91 (8th Cir. 2022). The officer's use of force is "judged from the perspective of a reasonable officer on the scene," considering "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Pollreis v. Marzolf*, 9 F.4th 737, 747 (8th Cir. 2021) (quoting *Graham*, 490 U.S. at 396). In our evaluation, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Burbridge*, 2 F.4th at 780 (quoting *White v. Jackson*, 865 F.3d 1064, 1074 (8th Cir. 2017)).

As the Supreme Court recently reiterated, our "inquiry into the reasonableness of police force requires analyzing the 'totality of the circumstances.'" *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (quoting *County of Los Angeles v. Mendez*, 581 U.S. 420, 427–28 (2017); *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). "[T]he situation at the precise time of the shooting will often be what matters most," but "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.* Relevant factors we may consider include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Here, we conclude Sergeant Miller's use of force was reasonable under the totality of the circumstances. He stood from a distance firing pepperballs as protesters scaled a security fence surrounding a construction site under threat.

-5-

Hollamon and other protesters defied officer commands not to cross the fences and trespassed with the goal of creating havoc and chaos to disrupt and delay construction. As they breached the barriers protecting the construction site, they carried a device used to lock themselves to equipment so that machinery could not function. In fact, that same evening, protesters had previously forced work to stop at the site because they locked themselves to a vehicle at the entrance gate. The government's interest in using force to protect the construction and to control the situation was not minimal.

Hollamon asks us to characterize the projectile used by Sergeant Miller as deadly force, analogizing it to the force used in *Cole ex rel. Est. of Richards v. Hutchins*, 959 F.3d 1127, 1131 (8th Cir. 2020); *Smith v. Kilgore*, 926 F.3d 479, 482 (8th Cir. 2019); *Torres v. Madrid*, 141 S. Ct. 989, 994 (2021); and *Tennessee v. Garner*, 471 U.S. 1, 4 (1985). But those cases involved officers firing live ammunition. Here, Sergeant Miller deployed force designed to bring about compliance through the irritation of chemicals released on impact and the infliction of a non-lethal amount of pain upon impact. Though Hollamon cites evidence alleging the dangers of certain types of launched projectiles, he admits pepperballs are not always deadly. We have explained that "[t]he mere recognition that a law enforcement tool is dangerous does not suffice as proof that the tool is an instrument of deadly force." *Kuha v. City of Minnetonka*, 365 F.3d 590, 598 (8th Cir. 2003) (amended Apr. 27, 2004) (quoting *Robinette v. Barnes*, 854 F.2d 909, 913 (6th Cir. 1988)), *overruled on other grounds by*, *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 395–96 (8th Cir. 2007) (en banc). Even if "force that is typically non-lethal *can* rise to the level of deadly force depending on the circumstances," those circumstances are not present here. *See Stewart v. Garcia*, 139 F.4th 698, 706 (8th Cir. 2025) (emphasis added).

Hollamon claims the pepperballs caused serious injury as shown by the symptoms arising after the incident (such as loss of consciousness, headaches, disorientation, memory loss), but we note that in the moment the use of force did not keep Hollamon from continuing to participate in the protesters' blitz. *See Kingsley*,

576 U.S. at 397 (noting the court may consider "the extent of the plaintiff's injury"). Hollamon testified in his deposition that he knew he had been hit, but "it wasn't debilitating" nor did it stop him from "being able to function." Indeed, he gathered himself among the other protesters, strategizing how they could cross the inner fence and adjusting their protective gear. Hollamon then crawled forward to the inner fence and stabilized the protesters' ladder while protesters tried to climb it. Even after the second attempt to breach the inner fence was thwarted and officers entered the area, Hollamon fled. What is more, Sergeant Miller tempered his force as protesters came closer, switching to deploying chemical spray. *See Kingsley*, 576 U.S. at 397 (noting the court may consider "any effort made by the officer to temper or to limit the amount of force").

Hollamon tries to persuade us that Sergeant Miller's conduct was unreasonable by pointing to our statement in a prior decision — "we have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him." *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022). True, *Mitchell* also involved force used against an individual trespassing and obstructing a government function, but this court was under a motion to dismiss standard of review. *Id.* at 898–99. Under that standard, this court assumed the nonconclusory allegations in the complaint were true, and the complaint did not "suggest that [the plaintiff] threatened anyone or fled or resisted arrest; on the contrary, it alleged that he simply stood with his hands above his head." *Id. See also Poemoceah v. Morton County*, 117 F.4th 1049, 1055 (8th Cir. 2024) (concluding a plaintiff plausibly alleged an excessive force violation when he was "peacefully attempting to negotiate the safe passage of elders from the site of the protest" and remained at a distance without making any sudden movements when shot with a rubber bullet). Unlike *Mitchell* and *Poemoceah*, the summary judgment evidence here reveals Hollamon and his colleagues were not peacefully protesting when officers deployed force. Instead, they forced the officers' hands by defying orders and "No Trespassing" signs and advancing toward the officers and the construction site despite verbal commands to stop and physical attempts to prevent

their actions. Sergeant Miller did not face a peaceful protest but a deliberate attempt to overwhelm officers and gain access to private property for the purposes of causing chaos and disrupting construction. *See White*, 865 F.3d at 1079 (concluding officer's use of non-lethal projectiles was reasonable when the officer "could have concluded that [the plaintiff] had been a part of the violent crowd, that his advances toward the skirmish line posed a threat to officer safety, and that he disobeyed officer orders to stop").

Unlike the circumstances here, the cases cited by *Mitchell* to explain when more than *de minimis* force is unreasonable involved unjustified force against *compliant* individuals. *See Jackson v. Stair*, 944 F.3d 704, 711–12 (8th Cir. 2019) (the suspect "did not appear to pose a threat to law enforcement, resist arrest, or flee – he was on his back, writhing on the ground"); *Div. of Emp. Sec. v. Bd. of Police Comm'rs*, 864 F.3d 974, 979 (8th Cir. 2017) (the "suspects exited the house when instructed to do so and, once they were in the back yard, they followed all of [the officer]'s commands"); *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) (the suspect "was walking away from" the officers and "did not pose an immediate threat to the safety of the officers or others" when an officer ran and tackled the suspect from behind without warning); *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012) (the suspect "was not threatening anyone, was not actively resisting arrest, and was not attempting to flee"); *Shannon v. Koehler*, 616 F.3d 855, 863 (8th Cir. 2010) (the suspect "was not threatening anyone, not resisting arrest, and so on"). Hollamon and his fellow protesters cannot be characterized as compliant. Hollamon and his group instigated the need for officer engagement by disobeying officers' commands not to cross the security fences and advancing toward the officers. *See Cravener v. Shuster*, 885 F.3d 1135, 1139 (8th Cir. 2018) ("This court has granted qualified immunity to officers . . . where an individual refuses to comply with reasonable orders."). Sergeant Miller's use of pepperballs against Hollamon was reasonable under these circumstances, and he is thus entitled to summary judgment.[2]

---

[2]Hollamon also argues he has a "live claim" against the County of Wright under *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978). But

### III. Conclusion

For the foregoing reasons, we affirm the district court's judgment.

KELLY, Circuit Judge, concurring.

In my view, the district court correctly concluded Hollamon failed to offer sufficient evidence that would allow a reasonable jury to find he was seized for purposes of his Fourth Amendment claim. I would, therefore, affirm on that "threshold question," see Dundon v. Kirchmeier, 85 F.4th 1250, 1255 (8th Cir. 2023), and decline to reach the subsequent issue of whether the challenged use of force was reasonable.

In a use of force case like this one, the Supreme Court's decision in Torres guides our analysis. See generally Torres v. Madrid, 592 U.S. 306 (2021). The "first step" is to determine whether a seizure occurred at all. Id. at 325. "[T]he application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." Id. However, neither accidental force nor "force intentionally applied for some other purpose" will qualify as "an intent to restrain." Id. at 317. As such, we have suggested that force applied with an intent to disperse, as in breaking up a protest, does not constitute a seizure. E.g. Dundon, 85 F.4th at 1256 ("Our decisions, however, have recognized a potential distinction between force used with intent to apprehend and force used with intent to disperse or repel.").[3] "[T]he appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain[.]" Torres, 592 U.S. at 317.

---

Hollamon failed to assert such a claim in the district court. Even if he did, "[b]ecause [his] constitutional rights were not violated, his *Monell* claim fails." *See Stearns v. Wagner*, 122 F.4th 699, 704 (8th Cir. 2024).

[3]The district court raised an important concern that making a legal distinction between being "free to leave" and being "free to stay" could create a "legal black hole," whereby officers would be permitted to use *any* level of force to disperse a crowd. Hollamon v. County of Wright, No. 22-cv-2246, 2024 WL 3653092, at *12

Hollamon argues that a reasonable jury could conclude he was seized when Sergeant Miller shot him with pepperballs. Viewing the evidence in the light most favorable to Hollamon, there is some support for a finding that Miller used force with an objective intent to restrain when he fired his pepperball launcher. For example, at least one officer declared that all of the protestors who were in the No Man's Land were under arrest around the same time the pepperballs were deployed. See Torres, 592 U.S. at 318 ("[T]he conduct of the officers—ordering Torres to stop and then shooting to restrain her movement—satisfies the objective test for a seizure[.]"); Irish v. McNamara, 108 F.4th 715, 719 (8th Cir. 2024) (holding that, even after Torres, an officer's subjective intent is relevant to the objective intent analysis "insofar as that [subjective] intent has been conveyed to the person confronted"). And Hollamon was eventually arrested after he was struck with pepperballs. See Dundon, 85 F.4th at 1256.

But most of the evidence in the record weighs against this finding. Though not dispositive, Hollamon was not actually stopped as a result of the use of pepperballs. Compare Brower v. County of Inyo, 489 U.S. 593, 598–99 (1989) ("We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.") with Torres, 592 U.S. at 325 ("[T]he application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."). Indeed, Hollamon continued to participate in protest activities after he was struck multiple times by pepperball rounds.

---

n. 16 (D. Minn. Aug. 5, 2024) (quoting Cole v. Lockman, No. 21-CV-1282, 2024 WL 328976, at *5 (D. Minn. Jan. 29, 2024) (quoting Shawn E. Fields, *Protest Policing and the Fourth Amendment*, 55 U.C. Davis L. Rev. 347, 361, 364 (2021))). As the district court explained, under that logic, if the officers are merely trying to disperse, there would be no "seizure" and the Fourth Amendment's reasonableness requirement would not apply. Id. At some point, we may be required to examine the contours of this "black hole," but I agree with the district court that we need not do so here.

And neither Hollamon nor any other protestor was arrested "promptly after" pepperballs were used against them. See Martinez v. Sasse, 37 F.4th 506, 510 (8th Cir. 2022). Hollamon was arrested about 50 minutes after he was struck. During those intervening 50 minutes, Hollamon persisted in advancing toward the construction zone—and toward the police, who notably did not advance on him as would be expected if they intended to seize him. It was not until he had crossed the outer fence and the No Man's Land, and assisted others in breaching the inner fence, that Hollamon was arrested. In that time, many of Hollamon's fellow protestors chose to leave the area completely, and no one disputes that the protestors who left were never identified or arrested. The record contains no evidence that any officer followed them or attempted to track them down after they departed. In fact, video evidence depicts more than a dozen officers—including Miller—standing, watching, and talking amongst themselves when Hollamon was struck with pepperballs. For approximately 45 minutes after Hollamon was last struck, no officer even entered the No Man's Land where Hollamon was located. Taken together, these facts lead to the conclusion that officers deployed pepperballs at Hollamon and the other protestors for the purpose of dispersing them from the construction zone—and on many of the protestors, it worked.

Moreover, when Hollamon eventually was arrested, pepperballs were not the mechanism of his arrest. See Dundon, 85 F.4th at 1256; Wolk v. City of Brooklyn Center, 107 F.4th 854, 859 (8th Cir. 2024) ("[W]hile Wolk's complaint generally alleges that some protesters were thrown to the ground for arrest, which tends to show an intent to apprehend rather than disperse, Wolk does not allege that these actions caused Wolk's injuries."). Instead, officers held Hollamon to the ground and zip-tied his wrists. On this record, no reasonable factfinder could conclude that Miller objectively intended to restrain Hollamon by means of pepperballs.

Alternatively, Hollamon argues the use of pepperballs under these circumstances rose to the level of deadly force. It is true that using deadly force nearly always—if not always—objectively reflects an intent to restrain. Cole ex rel. Est. of Richards v. Hutchins, 959 F.3d 1127, 1132 (8th Cir. 2020) ("A police

-11-

officer's use of deadly force against a suspect is a 'seizure' under the Fourth Amendment."); Tennessee v. Garner, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). However, the instant record would not allow a reasonable juror to conclude that Miller intentionally used deadly force against Hollamon. There is nothing in this record that suggests pepperballs are not an appropriate means of crowd dispersal. The record includes some evidence that pepperballs can cause serious injury or death when used under certain circumstances, particularly when fired at the head or neck. It also includes evidence that Hollamon was struck in the head with a pepperball, and Miller testified that he "believe[d] all of [his] rounds struck where they were intended." But Miller testified that he was trained to fire pepperballs at the "center mass of someone's body," and that he did not intentionally fire a pepperball round at anyone's neck or head on the day of the protest. See Torres, 592 U.S. at 317 ("Accidental force will not qualify."); Irish, 108 F.4th at 720 ("[C]ases where officers . . . accidentally shoot a bystander who is not the intended target of police action[]" generally do not "find seizures[.]" (citation omitted)).[4] On this record, a reasonable juror could not conclude Miller intended to use deadly force against Hollamon.

_____

[4]Even if there may be a point at which less lethal force is applied in such a manner that a reasonable jury could conclude the user of that force constructively intended to use it in a lethal manner, we are not faced with sufficient evidence of such conduct here.