# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-2633

_____

Robin Kirkland Neal

*Plaintiff - Appellee*

v.

Daniel Ficcadenti, in his individual capacity as an officer of the St. Paul Police Department

*Defendant - Appellant*

City of St. Paul

*Defendant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: June 15, 2018
Filed: July 12, 2018

_____

Before LOKEN, GRUENDER, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

In the late evening hours of June 6, 2012, police officers responded to a call that a witness had seen a man retrieve a gun from a black sedan parked outside of Born's Bar, a tavern located on Rice Street in Saint Paul, Minnesota. At the scene,

the officers discovered a black sedan containing three occupants, none of whom perfectly matched the description of the suspect. After apprehending the driver, the officers commanded Appellee Robin Neal and another passenger to get out of the car with their hands up.

The scene, which was captured on video, was chaotic. Music blared from Born's Bar. A police dog barked incessantly. Multiple officers, guns drawn, shouted multiple commands. Neal alighted from the sedan as directed with his hands up—but immediately began to act somewhat erratically. He spent a minute wandering around the sedan, dropped his hands at least five times, and failed to promptly follow a command that he walk towards the officers.

The appellant, Officer Daniel Ficcadenti, commanded Neal to come to him with his hands up. Neal finally complied. As Neal got within arm's reach, Officer Ficcadenti conducted an abrupt arm-bar takedown, injuring Neal. Neal brought this 42 U.S.C. § 1983 action alleging that Officer Ficcadenti applied excessive force when he brought Neal to the ground.[1] The district court[2] denied qualified immunity to Officer Ficcadenti, finding that the evidence when viewed in a light most favorable to Neal showed that in 2012 it was clearly established that the use of an arm-bar takedown technique on a suspect who was neither threatening nor resistant violated the Fourth Amendment's prohibition against unreasonable searches and seizures.

We have jurisdiction over this interlocutory appeal of a denial of qualified immunity because the issue of a violation of a clearly established constitutional right is a question of law. See Jackson v. Gutzmer, 866 F.3d 969, 975 (8th Cir. 2017). The

---

[1]Neal also brought a failure-to-train claim against the City of St. Paul, which is not at issue on this appeal.

[2]The Honorable Susan R. Nelson, United States District Judge for the District of Minnesota.

question may be pursued in an interlocutory fashion because qualified immunity is an immunity from suit that is effectively lost if the case is permitted to erroneously proceed to trial. Payne v. Britten, 749 F.3d 697, 700 (8th Cir. 2014) (citing Scott v. Harris, 550 U.S. 372, 376 n.2 (2007)). We agree with the district court that, viewed in a light most favorable to Neal, the facts give rise to a question of unreasonable and excessive force for the ultimate finder of fact. We affirm.

## I.    Background

We view the facts in a light most favorable to Neal, the non-moving party. On June 6, 2012, a witness contacted 911 to report that a heavy-set black male in his forties wearing a red and white shirt and a baseball cap had retrieved a gun from a black four-door sedan parked outside of Born's Bar in St. Paul, Minnesota. The witness reported that the suspect had placed the gun in his waistband and that he was currently leaning against a wall. Born's Bar is located on Rice Street in a rough area of the city. Police officers have frequently been dispatched to the area to address criminal activity, including violent activity.

Neal and his companions, Anthony Lee and Kevin O'Bannon, had arrived at Born's Bar earlier in the evening to watch a basketball game. None of the men matched the suspect's physical description. All three men were in their fifties. Neal was a slender man dressed in jean shorts and a black shirt. Both Lee and O'Bannon wore blue shirts. O'Bannon sported a baseball cap. Unfortunately, the hapless trio had arrived in a black four-door sedan driven by O'Bannon. The car was parked a couple of car lengths from the entrance of the bar. During the game, the three friends consumed alcohol. Neal was tested after the incident and had a blood alcohol concentration of 0.231.

Immediately prior to the time that officers arrived at the scene, the three men left Born's Bar and got into O'Bannon's black sedan. O'Bannon was in the driver

seat, Neal in the front passenger seat, and Lee in the rear passenger seat. Before the car moved, Saint Paul police officers began to arrive in number. Officer Michael DeTomaso was one of the first to arrive on the scene. He was soon followed by a number of officers, including Officer Ficcadenti. The officers established a horseshoe formation around O'Bannon's sedan and exited their cars. Most had their guns unholstered and pointed at the sedan. The scene was captured on squad videos from Officers DeTomaso, Tschida, and Ficcadenti. It was 11:22 p.m.

Officer DeTomaso loudly commanded O'Bannon to get out of the vehicle with his hands up and walk towards the officer. O'Bannon complied and was quickly taken into custody and handcuffed.

At about this time, the scene became more chaotic as the loud music from the bar was joined by a police dog barking persistently and multiple officers screaming commands at Neal and Lee. The two men were directed to get out of the car with their hands up. Neal stepped out, followed immediately by Lee. An officer yelled out "One at a time!" Lee froze with his hands in the air near the rear passenger door and stood fixed in that place and position throughout the encounter.

Neal, on the other hand, failed to comply. While he exited with his hands up, he failed to come towards one of the officers, instead wandering around the sedan. He dropped his hands five times. He looked in an apparently confused manner at Lee. All the while, officers hollered at Neal. The officers told Neal, who they repeatedly referred to as "black shirt," to step onto the street and to come to them with his hands up. Officer Ficcadenti was specifically directing Neal to stop circling the sedan and to come to him with his hands up, saying, "Hey, guy in the black shirt, no, no, no! Hey black shirt!" and "Come here!" At one point Neal dropped his hands and lifted his shirt, as if to show he was unarmed.

-4-

Eventually Neal complied. As he was walking towards Officer Ficcadenti, he dropped his arms to chest level and then motioned towards the officer as if trying to motion that he was coming towards the officer. He was directed to "come here." Neal continued walking towards Officer Ficcadenti. As soon as Neal was within arm's reach, he was forcefully brought to the ground by what the officer describes as an "arm-bar takedown." The video shows that Officer Ficcadenti abruptly grabbed Neal's left arm and forcibly slammed him face-down into the pavement. Officer Ficcadenti testified at his deposition that while he often uses less forceful techniques such as having arrestees place their arms behind their backs or kneel with their hands on their heads, he used the more forceful approach on Neal as first resort. The entire episode, from the time Neal exited the sedan until he was slammed onto the pavement face-down, took one minute and six seconds.[3] All parties agree that at the time the arm-bar takedown was effectuated Neal was compliant.

Officer Ficcadenti asserts that the force used was reasonable and necessary because Neal was initially non-compliant, he feared that someone had a gun, and it was imperative that Neal be handcuffed as soon as possible so that attention could be re-directed to Lee and officers could completely defuse the situation.

During his deposition, Neal explained that his delayed responses may have been the result of the chaos on the scene, particularly the multiple officers directing him. He opined that he may have dropped his hands temporarily at times because he was anticipating an officer to come and handcuff him. Officer Ficcadenti agreed during his deposition that Neal ultimately complied by walking towards Officer Ficcadenti with his hands up.

---

[3]Ironically, as Neal was walking towards Officer Ficcadenti, the dispatcher informed the police that the "Male with the gun just walked out the front door." The suspect was arrested and searched. He was found to be in possession of a hammer. No gun was found.

## II.    Discussion

We review *de novo* a district court's ruling on qualified immunity, viewing the record in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party.  Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010) (citing Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009)).  To determine whether an officer is entitled to qualified immunity, we ask: (1) whether the facts the plaintiff has presented, when viewed in his favor, show that the conduct of the officer violated a constitutional right, and (2) whether that constitutional right was clearly established at the time of the incident such that a reasonable officer would have known his or her actions were unlawful.  Tatum v. Robinson, 858 F.3d 544, 547 (8th Cir. 2017) (citing Peterson v. Kopp, 754 F.3d 594, 600 (8th Cir. 2014)).

### A.    Violation of a Constitutional Right

In an excessive force case, "[a]n officer's use of force violates the Fourth Amendment if it is objectively unreasonable in light of the facts and circumstances of the particular case, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  Hollingsworth v. City of St. Ann, 800 F.3d 985, 989 (8th Cir. 2015) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  We evaluate the objective reasonableness of the use of force by looking at the particular circumstances of each case, including "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officer or others, and whether he [wa]s actively resisting arrest or attempting to evade arrest by flight."  Wertish v. Krueger, 433 F.3d 1062, 1066 (8th Cir. 2006) (quoting Graham, 490 U.S. at 396).

When first arriving on the scene, officers had reason to be on high alert.  They were responding to a call that a witness had seen a man grab a gun from a black sedan parked near Born's Bar, place the gun in his waistband, and stand outside near the

-6-

bar. It was nighttime, and the bar and surrounding area were well-known to officers because they were frequently called there to address criminal activity. When the officers arrived, they found an occupied black sedan parked outside the bar. Even though possession of a gun in itself is not a crime, the officers faced an uncertain, possibly dangerous, situation.

Even so, a reasonable officer is not permitted to ignore changing circumstances and information that emerges once arriving on scene. See Ngo v. Storlie, 495 F.3d 597, 603 (8th Cir. 2007) ("[E]ven though Storlie was responding to a severe crime—a fellow officer had been shot—a reasonable officer arriving at the scene would have recognized that Ngo did not pose an immediate threat to the officers' safety or the safety of others."). In this case, it became immediately apparent that none of the men detained in this encounter matched the description of the suspect. None of them were a heavy-built black man in his forties wearing a baseball cap and red and white shirt. Officer Ficcadenti's repeated reference to Neal as "black shirt" makes clear that he quickly realized that Neal was not dressed similarly to the suspect. Likewise, a reasonable officer would have recognized that Lee did not match the physical description. O'Bannon was already in custody.

While the appellant makes much of Neal's wandering, any danger caused by Neal wandering around the sedan was mitigated by the fact that O'Bannon had been apprehended; Lee stood in one place with his hands up; Neal mainly kept his hands up as he walked; and several officers were on the scene with guns drawn and pointed in the direction of the sedan. For these reasons, the first two factors—the severity of the crime and the threat to safety—weigh against the reasonableness of the force used by Officer Ficcadenti.

We turn to the question of whether Neal resisted arrest. Officer Ficcadenti asserts that this case presents a passive resistance case in which the use of force is justified, noting that we have previously stated: "[w]hen a suspect is passively

resistant somewhat more force may reasonably be required." Wertish, 433 F.3d at 1066-67. The passive resistance involves Neal's initial failure to follow commands, which Neal explains was the result of natural confusion arising out of the chaotic conditions. Law enforcement officers are not required to read a suspect's motivations in failing to obey commands—it is enough that the officer reasonably perceives that the suspect is not following orders as given. Officer Ficcadenti was reasonable in his initial inference that Neal was engaged in an act of passive resistance. This changed when Neal approached Officer Ficcadenti with his hands up in complete compliance with the orders being given to him. Officer Ficcadenti admitted in his deposition that at the time the arm-bar takedown was effectuated Neal was in full compliance with his orders.

The officer also asserts that under our precedent in Hosea v. City of St. Paul, 867 F.3d 949 (8th Cir. 2017), the force used was neither unreasonable nor excessive. We disagree. In Hosea, an alleged domestic violence victim was within reach of Hosea, Hosea had only reluctantly begun to partially comply with the orders, and the situation remained fluid and dangerous. Neal, on the other hand, was fully compliant with his hands above his head when the force was imposed on him.

Neal has provided adequate evidence that he neither posed a threat to anyone's safety nor resisted arrest at the time that Officer Ficcadenti executed the arm-bar takedown. We are satisfied that these facts, construed in a light most favorable to Neal, establish a violation of a constitutional right to be free from unreasonable and excessive force.

## B. Clearly Established Right

We turn now to the question of whether or not the constitutional right that Officer Ficcadenti allegedly violated was clearly established as of June 6, 2012. We have said many times that "[t]he right to be free from excessive force in the context

of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures." Shannon v. Koehler, 616 F.3d 855, 864 (8th Cir. 2010) (quoting Brown v. City of Golden Valley, 574 F.3d 491, 499 (8th Cir. 2009)). The "salient question" is whether the state of the law at the time the force was exerted gave Officer Ficcadenti "fair warning" that his alleged treatment of Neal was unconstitutional. Hope v. Pelzer, 536 U.S. 730, 741 (2002).

In June 2012, the state of the law would have given a reasonable officer fair warning that using physical force against a suspect who was not resisting or threatening anyone was unlawful. See, e.g., Montoya v. City of Flandreau, 669 F.3d 867, 873 (8th Cir. 2012) ("[T]he contours of the right at issue were sufficiently clear to inform a reasonable officer in Officer Hooper's position it was unlawful for him to perform a 'leg sweep' and throw to the ground a nonviolent, suspected misdemeanant who was not threatening anyone, was not actively resisting arrest, and was not attempting to flee.").

After construing the facts in a light most favorable to Neal, i.e. that he was fully compliant at the time that Officer Ficcadenti applied the arm-bar takedown maneuver on him, that conduct violated a clearly established constitutional right on June 6, 2012. The district court correctly concluded that this is one of those relatively rare cases in which a question of fact is presented for the ultimate finder of fact and qualified immunity does not apply.

## III.  Conclusion

For the foregoing reasons, we affirm the district court's order denying summary judgment on the basis of qualified immunity.

_____

-9-