# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3391

_____

Sumaya Aden, as next-of-kin and trustee for the Estate of Isak Abdirahman Aden, Decedent

*Plaintiff - Appellee*

v.

City of Bloomington, Minnesota; City of Burnsville, Minnesota

*Defendant*s

City of Eagan, Minnesota

*Defendant - Appellant*

City of Edina, Minnesota

*Defendant*

Officer Jacob Peterson; Officer Matthew Ryan; Officer Daniel Nelson; Officer Adam Stier; Officer Anthony Kiehl; Chief Roger New; Lieutenant Andrew Speakman; Sergeant Corey Cardenas

*Defendants - Appellants*

Sergeant Maksim Yakovlev; John and Jane Does, 1-10

*Defendant*s

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: December 17, 2024
Filed: February 12, 2025
_____

Before SMITH, GRUENDER, and STRAS, Circuit Judges.
_____

GRUENDER, Circuit Judge.

This appeal concerns a suit brought under 42 U.S.C. § 1983 and Minnesota law by Sumaya Aden ("Ms. Aden") as next of kin and trustee of the estate of Isak Aden ("Aden"). Defendants—the City of Eagan and eight individual officers— appeal the district court's partial denial of their motion for summary judgment based on qualified and official immunity. We reverse, finding that the officers are entitled to qualified and official immunity and that the City of Eagan is not subject to *Monell* liability.

## I. Background

Shortly after 6:00 p.m. on July 2, 2019, Isak Aden's ex-girlfriend called 911 to report that, while she and Aden were sitting in her car, Aden had pointed a gun at her and ordered her to drive away from her residence. As they neared the Eagan Outlet Mall, she turned into the oncoming traffic lane to attract attention, stopped the car, and ran away from the vehicle. Aden fled into a nearby wooded area. Shortly afterwards, a bystander reported hearing a gunshot come from the wooded area where Aden had run. Aden later admitted to negotiators that his firearm had discharged when he accidentally dropped it.

Around 6:45 p.m., officers found Aden crossing a road into an industrial parking lot that abutted a commercial building. Aden held the gun to his head as he walked. He eventually sat down on the parking lot curb with his back to the building, facing an empty parking lot. His gun remained aimed at his head. The officers

-2-

pointed their guns at Aden, ordered him to put his gun down, and started negotiating with Aden using a public address system. At 7:08 p.m., Aden finally set the gun down near his right foot but then picked it up again just a few minutes later.

Over time, police officers and SWAT teams from multiple cities responded to the scene. They were equipped with tactical body armor, helmets, assault weapons, less-lethal weapons, bullet-proof and bullet-resistant ballistic shields, and three armored vehicles. Officers confirmed that the area was clear of bystanders. Four snipers kept their rifles trained on Aden. Altogether, over eighty officers from eight different police forces were present.

At 7:25 p.m., a SWAT team member took over negotiations from inside an armored vehicle. After an hour and a half, Aden again placed his gun on the pavement, this time between his legs. Shortly thereafter, officers delivered a cell phone to Aden by approaching him in an armored vehicle and tossing down a cardboard box that contained the cell phone. Negotiations continued via phone. At 9:59 p.m., officers estimated that the gun was about three feet to Aden's right. At 10:03 p.m., Aden moved slightly closer to the gun and officers estimated that he was about a foot away from the gun. At 10:31 p.m., officers estimated that Aden was about a foot and a half away from the gun. Aden repeatedly refused to surrender and told officers that he was "not willing to go to jail tonight."

Meanwhile, the command officers worked on a tactical plan to apprehend Aden. The officers planned to use the element of surprise to seize him while he was separated from his gun. Some officers would throw flashbang grenades at Aden to disorient him, while others would fire forty-millimeter less-lethal foam bullet rounds at his left side. The plan anticipated that Aden would react to his left—away from the gun on his right—so that the arrest team would have a chance to rush in and apprehend him. Other officers stood ready to provide lethal cover for the arrest team. Police Chief Roger New approved the arrest plan. He later testified that he wanted to take advantage of Aden being separated from his weapon. He also testified he

was concerned Aden might flee with a firearm and that the police did not have a secure perimeter.

At 10:37 p.m., as Aden spoke on the phone with negotiators, officers launched the tactical plan. Three flashbangs exploded close to Aden as officers opened fire with foam bullets, striking Aden in his left side. Rather than falling to the left and away from the gun, Aden reacted to his right—towards the gun—with the cell phone still in his left hand. He grabbed the gun with his right hand and began to raise it. Before the gun was raised to knee height, officers deployed lethal rounds. As Aden fell backwards, the pistol discharged, firing downwards into the ground. In total, five officers fired twelve lethal rounds, resulting in the eleven gunshot wounds that killed Aden. All lethal rounds were fired within 3.73 seconds of Aden picking up his gun. A squad car camera captured the incident on video.

Ms. Aden, Aden's next-of-kin and trustee of his Estate, sued various cities and officers under § 1983 and Minnesota law, arguing that the officers' actions constituted an excessive use of force under the federal and Minnesota constitutions and was a tort under Minnesota law. During litigation, the parties stipulated to dismiss the Defendant Cities of Bloomington, Burnsville, and Edina, as well as Defendants Sergeant Maksim Yakovlev and Jane and John Does. The remaining defendants—the City of Eagan, the three supervisory officers who developed and approved the tactical plan (Chief Roger New, Lieutenant Andrew Speakman, and Sergeant Corey Cardenas), and the five officers who fired lethal rounds (Jacob Peterson, Matthew Ryan, Daniel Nelson, Anthony Kiehl, and Adam Stier)—moved for summary judgment based on qualified and official immunity. The district court granted in part, dismissing a substantive due process claim and dismissing the excessive use of less-lethal force claim as it applied to the lethal-force defendants. Otherwise, the district court declined to dismiss, finding that the officers were not entitled to either federal qualified immunity or Minnesota official immunity and that the City of Eagan may be liable under *Monell*.

-4-

## II. Discussion

Defendants appeal the district court's denial of qualified immunity, its finding that the City of Eagan may be subject to *Monell* liability, and its denial of Minnesota official immunity. Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Though we ordinarily "lack jurisdiction to hear an immediate appeal from a district court's order denying summary judgment," we have "limited authority to review the denial of qualified immunity through an interlocutory appeal under the collateral order doctrine." *Langford v. Norris*, 614 F.3d 445, 455 (8th Cir. 2010) (internal quotation marks and alteration omitted).

### A. Qualified Immunity

We first address whether the officer defendants are entitled to qualified immunity. We review a denial of qualified immunity *de novo*, viewing the record in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor. *See Dunn v. Does 1-22*, 116 F.4th 737, 745 (8th Cir. 2024). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). "To determine whether a defendant is entitled to dismissal on the basis of qualified immunity, we consider (1) whether the official's conduct violated a constitutional right; and (2) whether the violated right was clearly established." *Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018) (internal quotation marks omitted). "Denial of qualified immunity will be affirmed if a genuine issue of material fact exists as to whether a reasonable officer could have believed his actions to be lawful." *Nance v. Sammis*, 586 F.3d 604, 609 (8th Cir. 2009) (internal quotation marks omitted).

The Fourth Amendment's prohibition against "unreasonable searches and seizures" includes the "right to be free from excessive force in the context of an arrest." U.S. Const. amend. IV; *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). Whether the force used was objectively unreasonable—and, thus, constitutionally excessive—is a legal question that requires us to consider "the totality of the relevant circumstances." *Westwater v. Church*, 60 F.4th 1124, 1128 (8th Cir. 2023). "What is objectively reasonable under the particular circumstances is evaluated from the perspective of a reasonable officer on the scene . . . and turns on those facts known to the officer at the precise moment he effectuated the seizure." *Cole ex rel. Est. of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (internal quotation marks and alterations omitted). Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The use of force is least justified against a nonviolent misdemeanant who does not flee or actively resist arrest and poses little threat to officers or the public." *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020). However, "[a]n officer is entitled to use the force necessary to effect an arrest," and even "[w]hen a suspect is passively resistant, somewhat more force may reasonably be required." *Id.* We first consider the supervisory officers who approved the tactical plan and the use of less-lethal force. We next consider the officers who deployed lethal force.

### 1. Less-Lethal Force

Ms. Aden argues that the supervisory officers violated Aden's constitutional right to be free from excessive force when they authorized the tactical plan and the use of less-lethal force against Aden. We disagree; the supervisory defendants are entitled to qualified immunity because their tactical plan reasonably addressed the threat Aden posed. First, the officers reasonably suspected Aden had committed a serious crime. *See Graham*, 490 U.S. at 396. Domestic assault with a firearm occurs when the defendant intends "to cause fear in another of immediate bodily harm" and a "firearm was used in any way during the commission of the assault." Minn. Stat.

-6-

§ 609.2242 (2023). Given what the girlfriend originally told the 911 operator—that Aden had pointed a gun at her and ordered her to drive away—the officers reasonably suspected Aden had committed domestic assault with a firearm.[1] Second, Aden was actively resisting arrest. *See Graham*, 490 U.S. at 396. He refused to move out of reach of his loaded gun, refused to surrender, and stated that he was "not willing to go to jail tonight." Third, Aden posed an immediate threat. *Id.* He had acted erratically all evening, admitted that his gun had discharged when he was in the wooded area, refused to surrender his weapon or to meaningfully cooperate with the negotiators, and within the past hour moved closer to his gun. In such a "tense, uncertain, and rapidly evolving" situation, *Graham*, 490 U.S. at 397, the officers reasonably designed a tactical plan—centering around the use of flashbangs and foam bullets as forms of less-lethal force—to address the threat that Aden posed and effectuate his arrest. Therefore, because they did not violate a constitutional right, the supervisory defendants are entitled to qualified immunity.

The district court denied qualified immunity to the supervisory defendants because it found that genuine issues of material fact existed—namely, whether Aden posed an immediate, "meaningful[]" threat. But the opposing "facts" cited by the district court—the testimonies of expert witnesses that the tactical plan was unreasonable and that "[t]here was no emergency" compared with the testimonies of officers who were concerned Aden would pick up his gun—are not facts at all but only inconsistent explanations for why the officers acted. This disagreement constitutes a legal dispute about the reasonableness of the officers' actions, not a factual dispute about what occurred. *See, e.g.*, *Westwater*, 60 F.4th at 1129 n.1 ("whether force used was objectively reasonable or constitutionally excessive is a

[1]Despite what she told the 911 operator, Aden's girlfriend had a different story at her home later that evening. She told an officer that Aden had not pointed the gun at her but that she had known it was in his waist band. She could not say when she had seen the gun or explain how she knew it was in his waistband. She also said she had never seen Aden with a weapon before and had never known him to be violent but that he had a short temper. Given her seeming uncertainty and that victims of domestic violence often recant, *see United States v. Farmer*, 567 F.3d 343, 347 (8th Cir. 2009), the officers reasonably credited her original testimony.

question of law"). And, as discussed, based on the undisputed facts, the officers' actions were reasonable.

Certainly, the officers might have chosen another course of action. But "the Constitution requires only that the seizure be objectively reasonable, not that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight vision." *See Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014) (internal quotation marks omitted). Qualified immunity gives law enforcement "breathing room to make reasonable but mistaken judgments." *Ashcroft*, 563 U.S. at 743. We will not engage in "Monday-morning quarterbacking" and "impose liability simply because the officers did not choose a better available method." *See Retz*, 741 F.3d at 918. Under the totality of the circumstances, the tactical plan was not objectively unreasonable and, thus, was not a constitutionally excessive use of force.

## 2. Lethal Force

Ms. Aden argues that the lethal-force defendants violated Aden's constitutional right to be free from excessive force when they deployed deadly force. "It is reasonable for an officer to use deadly force if he has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Rogers v. King*, 885 F.3d 1118, 1121 (8th Cir. 2018) (internal quotation marks omitted). Objective reasonableness is not a factual question—it is a matter of law. *See Westwater*, 60 F.4th at 1129 n.1. "Generally, an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar menacing action." *Cole*, 959 F.3d at 1132 (internal quotation marks omitted). However, officers need not wait to act until they are staring down the barrel of a loaded gun. *See Rogers*, 885 F.3d at 1121-22 (finding that officers reasonably perceived a threat of serious physical harm when defendant raised gun to shin-level). "Simply reaching for a loaded gun is enough to create a substantial risk of serious bodily injury to another person." *United States v. Hill*, 583 F.3d 1075, 1078 (8th Cir. 2009) (internal quotation marks and

alteration omitted) (holding that defendant's attempts to retrieve loaded firearm during struggle with officers created substantial risk of serious physical injury). "Additionally, before using deadly force, an officer should, when feasible, provide a warning." *Cole*, 959 F.3d at 1133 (internal quotation marks and alteration omitted).

Here, the lethal force defendants are entitled to qualified immunity because their conduct did not violate Aden's constitutional right to be free from the use of excessive force. They had probable cause to believe that Aden posed an immediate and serious threat of bodily injury. Knowing that Aden had behaved erratically and dangerously throughout the afternoon and evening, the officers deployed lethal force when they witnessed Aden reach for and raise his loaded gun. As he raised his gun, it discharged into the ground. At that time, at least seven officers were near Aden and not within an armored vehicle. The defendant officers reasonably perceived that Aden posed a threat of serious bodily harm and responded almost immediately—all shots were fired within 3.73 seconds of Aden picking up his gun. This was a "split-second judgment[]." *See Graham*, 490 U.S. at 397. Further, Aden was on notice that his possession of a loaded gun could be perceived as a threat. The officers had warned Aden several times throughout the evening that his gun posed a threat. *See Cole*, 959 F.3d at 1133. Altogether, the use of lethal force was objectively reasonable.

The district court found that a genuine factual dispute existed regarding whether Aden pointed his gun at the officers and thus, whether the officers were in immediate threat of serious harm. It found that "a jury could reasonably conclude" the use of lethal force was objectively unreasonable, given that Aden had not yet raised the gun above his knee and the officers on the scene were armed and wearing body armor. We disagree. First, the entire exchange was captured on video, providing undisputed facts. Second, regardless of whether Aden pointed his gun at the officers, he reached for a loaded gun and began to raise it. The officers reasonably perceived this as a "menacing action." *See Cole*, 959 F.3d at 1132; *Rogers*, 885 F.3d at 1121-22 (where officers acted reasonably in deploying deadly

force when defendant raised gun to shin-level). And third, a bullet poses a threat, *see, e.g.*, *Billingsley v. City of Omaha*, 277 F.3d 990, 995 (8th Cir. 2002), regardless of whether officers are armed or wearing body armor—as most on-duty officers presumably are. Altogether, we can discern no genuinely disputed issue of material fact.

In sum, because they did not violate a constitutional right, the lethal force defendants are entitled to qualified immunity.

## B. *Monell* Liability

We next address whether the City of Eagan is subject to *Monell* liability under § 1983. Ms. Aden's sole remaining theory for *Monell* liability is based on Police Chief New's authorization of the tactical plan. "Absent a constitutional violation by an employee, there can be no § 1983 or *Monell* liability." *Stearns v. Wagner*, 122 F.4th 699, 704 (8th Cir. 2024) (internal quotation marks and alteration omitted). The supervisory officers did not commit a constitutional violation; therefore, the City of Eagan is not subject to *Monell* liability.

## C. Minnesota Official Immunity

Finally, we address the denial of Minnesota official immunity for Ms. Aden's state law claims against both the officer defendants and the City of Eagan. "In Minnesota the official immunity doctrine provides that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Birkeland ex rel. Birkeland v. Jorgensen*, 971 F.3d 787, 792 (8th Cir. 2020) (internal quotation marks and alteration omitted). "In the context of official immunity, 'willful' and 'malicious' are synonymous, and the Minnesota Supreme Court has defined malice as 'nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" *Brown*, 574 F.3d at 500-01 (quoting *Rico v. State*, 472

N.W.2d 100, 107 (Minn. 1991)) (internal quotation marks omitted). We have already concluded that none of the officer defendants violated a constitutional right. Necessarily, therefore, the defendants could not have committed a "willful violation of a known right," *id.*, and are also entitled to official immunity under Minnesota law.

Because the officers are entitled to official immunity, the City of Eagan is also entitled to vicarious official immunity. "[V]icarious official immunity protects the government entity from suit based on the official immunity of its employee." *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998) (en banc). Thus, the City of Eagan is entitled to vicarious official immunity insofar as its employees are entitled to official immunity. Therefore, we reverse the denial of official immunity to all the defendants.

## III. Conclusion

For the foregoing reasons, we reverse the district court's partial denial of the defendants' motion for summary judgment and remand for entry of it based on qualified and official immunity.

_____