# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1285

_____

Matthew Locke

*Plaintiff - Appellant*

v.

County of Hubbard; Cory Aukes, in his official and individual capacity; Scott
Parks, in his official and individual capacity

*Defendants - Appellees*

------------------------------

Institute for Justice; National Police Accountability Project; Jessica Pishko;
Farhang Heydari; American Civil Liberties Union of Minnesota

*Amici on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 24, 2024
Filed: September 17, 2025

_____

Before GRUENDER, BENTON, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Matthew Locke sued Hubbard County, Sheriff Cory Aukes, and Chief Deputy Sheriff Scott Parks under 42 U.S.C. § 1983 and Minnesota law, alleging that the officers used excessive force against him during an oil pipeline protest. The district court granted the defendants' motion to dismiss, holding that Sheriff Aukes and Deputy Parks were entitled to qualified and official immunity and that the complaint failed to state a claim for municipal liability. Reviewing *de novo*, we reverse. *Mitchell v. Kirchmeier*, 28 F.4th 888, 895 (8th Cir. 2022) (standard of review).

We accept the facts alleged in Locke's complaint as true. *Id.* On August 16, 2021 at 8:03 a.m., dispatch reported that "numerous protesters" were trespassing on an Enbridge pipeline easement in Hubbard County, Minnesota and that four had attached themselves to construction equipment at the site. Locke and another protestor had locked their arms into a "sleeping dragon device" that was threaded through the track system of a Caterpillar excavator. Sleeping dragons are made with PVC or metal pipes, chicken wire, or rebar and filled with rocks or gravel, "requiring law enforcement to cut the devices off using power tools." Compl. ¶ 11.

Sheriff Aukes and Deputy Parks responded and tried to remove Locke from the sleeping dragon so they could arrest him. Parks applied "the mandibular angle technique" behind Locke's right ear, which "involves the application of pressure on a pressure point behind the ear to incapacitate someone by causing excruciating pain." Compl. ¶ 14. When that did not work, Parks applied the technique behind Locke's left ear. Locke still did not release himself. Parks then applied "the infra orbital technique," which "involves the application of pressure on the infra orbital nerve at the base of the nose." Compl. ¶ 18. Sheriff Aukes also applied pressure to Locke's hypoglossal nerve, mandibular angle, and/or infra orbital. Locke could no longer move the right side of his face "in a normal manner." Compl. ¶ 20.

The Hubbard County and Cass County extraction teams arrived and removed the sleeping dragon devices. EMTs evaluated Locke and took him to the hospital.

-2-

He was treated then moved to the Hubbard County Jail. Locke now suffers from facial paralysis (Bell's Palsy), tinnitus, and emotional distress.

Locke's complaint alleges an individual and official capacity § 1983 claim for violation of his constitutional rights and state law claims for assault and battery. Considering the federal claim first, we must decide whether Sheriff Aukes and Deputy Parks are "entitled to qualified immunity 'on the face of the complaint.'" *Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018) (citation omitted). To make that decision, we consider "(1) whether the official's conduct violated a constitutional right; and (2) whether the violated right was clearly established." *Id*. (citation omitted).

Constitutional Violation

Locke argues that the officers violated his Fourth Amendment right to be free from excessive force during an arrest. *See Aden v. City of Bloomington¸* 128 F.4th 952, 957 (8th Cir. 2025). We apply an objective reasonableness standard, paying "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). We judge the reasonableness of the force from "the perspective of a reasonable officer on the scene," *id.* at 396, who has "the knowledge of the defendant officer," *Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015).

Limited to the allegations in the complaint, a reasonable officer would have known that Locke was committing the nonviolent misdemeanors of trespass and obstruction, Minn. Stat. §§ 609.605 subd. 1, 609.50 subd. 1.[1] Trespass and

---

[1]According to court documents submitted with the defendants' motion to dismiss, Locke was charged with misdemeanor obstruction, misdemeanor disorderly conduct, gross misdemeanor trespass on a pipeline, and felony theft. He pleaded

obstruction are not "sever[e]" crimes. *See Graham*, 490 U.S. at 396 (considering the severity of the crime); *see also Mitchell*, 28 F.4th at 898–99 (trespass and obstruction of a government function not "serious" crimes); *Nieters v. Holtan*, 83 F.4th 1099, 1109 (8th Cir. 2023) (failure to disperse); *Peterson v. Kopp*, 754 F.3d 594, 600 (8th Cir. 2014) (trespass). Perhaps—as Sheriff Aukes and Deputy Parks claim—trespass and property seizure "can lead to increased risk of violent confrontation." Appellee's Br. 15. But nothing alleged in the complaint would lead a reasonable officer to believe that there was a risk of violence or that Locke "pose[d] an immediate threat" to anyone's safety. *Graham*, 490 U.S. at 396. Nor was Locke "actively resisting arrest." *Id.* That he could have submitted to his inevitable arrest but "did not release himself from the sleeping dragon device in response to th[e] torture tactic[s]," Compl. ¶¶ 15, 17, 19, does not mean that a reasonable officer would consider his noncompliance to rise to the level of active resistance, *Tatum v. Robinson*, 858 F.3d 544, 549 (8th Cir. 2017) ("Noncompliance and arguing do not amount to active resistance."). Even the officers' brief describes Locke's resistance as passive. Appellee's Br. 16–18.

---

guilty to misdemeanor trespass on a construction site, Minn. Stat. § 609.605 subd. 1(b)(9). The dissent states, "Locke was suspected of felony theft, a 'serious' crime."

Considering only the complaint, we are not convinced "a reasonable officer on the scene" would suspect Locke of the felony charged in the criminal complaint. *See Graham*, 490 U.S. at 396. Here's why. Locke was charged with violating Minn. Stat. § 609.52 subd. 2(a)(5)(i), theft "with intent to exercise temporary control only," which "manifests an indifference to the rights of the owner." The criminal complaint alleged that the value of the property exceeded $5,000. But when theft involves only temporary control, "value" means the greater of the "value of the use of the property or the damage which it sustained." § 609.52 subd. 1(3). Locke has alleged no facts suggesting $5,000 in use or damage to the excavator, and at least one Minnesota court has dismissed for lack of probable cause this same charge against a protestor who had crawled into a pipeline and locked himself to another protestor with a sleeping dragon device. *State v. Sponheim*, No. 29-CR-21-1298, slip op. (Minn. Dist. Ct. Hubbard Cnty. May 4, 2022).

Locke's complaint plausibly states a constitutional violation.[2] Taking his allegations as true, a reasonable officer would have known that the protestors were unlikely to release themselves and that the sleeping dragon devices would have to be cut off. As pleaded, the situation cannot be described as "tense, uncertain, and rapidly evolving"; nor were officers "forced to make split-second judgments" about the force necessary to arrest the protestors. *Graham*, 490 U.S. at 397. Instead, the officers had time to think about how to disperse the protestors and how to remove the sleeping dragons. They might have known that the extraction teams were en route. *See Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014) ("Among the factors that may, in appropriate circumstances, be considered within the totality of the circumstances is 'the availability of alternative methods of capturing or subduing a suspect.'" (citation omitted)). Sheriff Aukes and Deputy Parks also would have known that Locke was "the type of individual against whom the use of force is 'least justified,'" a nonviolent misdemeanant who did not flee or actively resist arrest and who posed no immediate threat to anyone's safety. *See Tatum*, 858 F.3d at 549 (citation omitted); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

Even so, Sheriff Aukes and Deputy Parks applied multiple pressure-point pain compliance techniques to Locke's head and neck. *See Edrei v. Maguire*, 892 F.3d 525, 542 (2d Cir. 2018) (a jury must decide whether "such techniques were a proportionate response to protestors purposefully making themselves difficult to arrest or [whether] 'the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances'" (citation omitted)); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 527 (7th Cir. 2012) ("Even when officers' goals are eminently reasonable, there are definite limits to the force officers may use to prod

---

[2]Locke could not have known the "knowledge of the defendant officer[s]," *Kingsley*, 576 U.S. at 399, so his complaint does not allege what Sheriff Aukes and Deputy Parks knew when they decided to use pain compliance techniques— specifically, whether they had experience with pipeline protestors or sleeping dragon devices, if they knew that Hubbard County and Cass County extraction teams were en route, or if they knew when the teams would arrive.

arrestees into obeying commands."). Considering the totality of the circumstances, Locke pleaded that the officers' force was excessive and not objectively reasonable as a matter of law.

Clearly Established Law

The more difficult question is whether Locke alleged the violation of a clearly established right. To be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Although the unlawfulness of the action must be apparent "in the light of pre-existing law," there is no requirement that "the very action in question has previously been held unlawful." *Id.*

Dismissing the case, the district court held that no case law "forbids the use of pain compliance techniques," so "Aukes and Parks were not on notice that their conduct was or would be clearly unlawful." D. Ct. Order of Jan. 22, 2024, at 5. The defendants similarly argue that it was not clearly established that pain compliance techniques amounted to more than *de minimis* force, which cannot support a claim of excessive force. *See Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011). But types of force are not categorically forbidden or categorically constitutional. *See Brown*, 574 F.3d at 498 n.5, 499 (describing taser as "a relatively new implement of force" and holding that a reasonable officer would have known that it was unlawful to tase the plaintiff in the circumstances of that case). Even the routine act of handcuffing can violate the Fourth Amendment when done with excessive force. *See Chambers*, 641 F.3d at 907; *see also Baude v. Leyshock*, 23 F.4th 1065, 1073–74 (8th Cir. 2022). Accepting the complaint's allegations as true, Locke has alleged that the force used against him was more than *de minimis*. *See* Compl. ¶¶ 14–20, 29 (alleging that the pain compliance techniques "caus[ed] excruciating pain," facial paralysis, and tinnitus).

-6-

Locke argues that it was clearly established that the officers could use no more than *de minimis* force against him. We agree. "[W]e have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him." *Mitchell*, 28 F.4th at 898. That is true even when a peaceful protestor ignores an officer's command. *Id.* at 896.

The officers argue that *Mitchell* is distinguishable because Locke resisted arrest. But Locke's resistance was passive, like the protestor in *Mitchell*, who ignored a countdown warning, "simply stood with his hands above his head," and was shot with lead-filled bean bags. *Id.* at 898. We have also considered *Poemoceah*, where the protestor "instinctively began running" from officers when they "charged towards him." *Poemoceah v. Morton Cnty.*, 117 F.4th 1049, 1053 (8th Cir. 2024) (cleaned up). The officers there tackled the plaintiff, then kneed or punched him, violating his clearly established right to be free from excessive force (even though a reasonable officer might view his conduct as fleeing). *Id.* at 1055. Our cases clearly establish that when protestors are noncompliant or passively resisting—but not actively resisting—officers can use only *de minimis* force in their arrests, unless some other circumstance justifies the use of more substantial force. *See, e.g.*, *Bernini v. City of St. Paul*, 665 F.3d 997, 1006 (8th Cir. 2012) (not unreasonable for sergeant to authorize non-lethal munitions when "[t]he circumstances led officers reasonably to believe that a growing crowd intended to penetrate a police line and access downtown St. Paul"). Because Locke did not actively resist arrest and the complaint does not allege any circumstances that would justify a greater level of force, it was unreasonable for Sheriff Parks and Deputy Aukes to use more than *de minimis* force.

True, "[w]hen a suspect is passively resistant, somewhat more force may reasonably be required." *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020) (quoting *Wertish v. Krueger*, 433 F.3d 1062, 1067–68 (8th Cir. 2006)). But in *Kohorst*, discovery revealed that the arrestee was extremely intoxicated, suspected of assault, "posed a threat to officer safety," and later was not only noncompliant,

-7-

but "appeared to be resisting." *Id.* at 877. Affirming the grant of summary judgment, we held that the officer had not used excessive force when he took down and tased the arrestee to handcuff him. *Id.* at 877–78. And in *Wertish*, the summary judgment record revealed that the arrestee drove erratically, did not pull over when the officer activated his emergency lights and siren, and then drove for five and half additional miles, "in and out of the roadside grassy ditch and twice cross[ing] into the westbound lane," before failing to comply with at least four orders to get out of his truck. 433 F.3d at 1064–65. We held that the arresting officer used a reasonable amount of force when he pulled the man from his truck, took him to the ground, climbed on top of him, and then "forcibly twisted" his arm to cuff him. *Id.* at 1065, 1067. Even in *Ehlers*, the summary judgment record indicated tense circumstances leading up to the officer's takedown of an arrestee who continued walking away from an officer, despite commands to stop. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1007 (8th Cir. 2017) (arresting officer arrived after plaintiff's wife, children, and friend were kicked out of a sporting event and then arrested after swearing at staff and fighting with security personnel; plaintiff himself ignored commands to step back from one officer and ignored further commands by the arresting officer).

The facts matter. We do not yet know enough about what led up to the officers' use of force or the facts related to each pain compliance technique. Reading the complaint and viewing inferences in favor of Locke, we believe he has adequately alleged that a reasonable officer would have known that he could use no more than *de minimis* force to arrest Locke. Discovery may tell a different story. Until then, Sheriff Aukes and Deputy Parks are not entitled to qualified immunity.

## Official Capacity Claim

We also reverse the district court's *sua sponte* dismissal of Locke's official capacity claim against Sheriff Aukes and Deputy Parks, which is, in effect, a claim against Hubbard County. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against

the entity."). A county is responsible under § 1983 when execution of its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The district court found that Locke failed to plead a policy or custom, but it did not consider whether Hubbard County is liable for Sheriff Aukes's official acts because he was the county's final policymaker for law enforcement practices. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) ("Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."). Because Locke did not have the chance to make this argument below, we remand for consideration of the final policymaker theory.

State Law Claims

We likewise reverse the grant of official immunity to Aukes and Parks on Locke's assault and battery claims. In Minnesota, official immunity protects public officials "from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion." *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990). But this does not extend to discretionary acts that are "willful or malicious wrong[s]." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991). Malice is defined in this context as "nothing more than . . . the willful violation of a known right." *Id.* (citation omitted). So our inquiry is less a subjective one "and more of an objective inquiry into the legal reasonableness of an official's actions." *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994). Sheriff Aukes and Deputy Parks are not entitled to official immunity because—as pleaded—their use of force was not objectively reasonable as a matter of law and violated Locke's known right to be free from excessive force. So we reverse the dismissal of Locke's state law claims against Sheriff Aukes, Deputy Parks, and the County. *See Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998) (holding that the municipality "is not entitled to vicarious official immunity" where government official "was not entitled to official immunity").

Reversed and remanded.[3]

GRUENDER, Circuit Judge, dissenting.

The court asserts that Locke adequately alleges (1) the officers violated his constitutional right, and (2) that this right was clearly established at the time of the incident. While I disagree with the court's constitutional analysis, I need not resolve that inquiry as the case can be easily resolved under the clearly established prong of the qualified immunity analysis. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that we may exercise discretion in deciding which prong of the qualified immunity analysis to address first).

The court claims that the unconstitutionality of the officers' conduct was clearly established based on *Mitchell* and *Poemoceah*. *Ante*, at 6-7. *See Mitchell v. Kirchmeier*, 28 F.4th 888 (8th Cir. 2022); *Poemoceah v. Morton Cnty*, 117 F.4th 1049 (8th Cir. 2024). However, the Supreme Court has emphasized that we do not "define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam). Rather, we must determine "whether the violative nature of *particular* conduct is clearly established." *Id.* This "specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (citation modified). *Mitchell* and *Poemoceah* are factually inapposite to the case at hand.

In *Mitchell*, we denied qualified immunity to an officer who deployed shotgun-propelled, lead-filled bean bags at a protester, shattering his eye socket, while the protester stood peacefully with his hands in the air. 28 F.4th at 898-99. The court asserts that *Mitchell* clearly establishes that Sheriff Aukes and Deputy Parks's conduct was unconstitutional because both Locke and the *Mitchell* protestor

---

[3]Our holding relies only on the complaint. We deny as moot the motions to strike the transcript of the YouTube video, the citation to a new link for the video, and the parts of the briefs that rely on the video.

passively resisted arrest and were suspected of crimes that were not severe.[4] *Ante*, at 4. But Locke was suspected of—and charged with—felony theft, a serious crime. *Ante*, at 3, n.1; *see Felony*, Black's Law Dictionary (12th ed. 2024) (defining "felony" as "[a] serious crime usu[ally] punishable by imprisonment for more than one year or by death"). Further, though the court describes the *Mitchell* protestor as passively resisting arrest because he ignored a countdown warning, *ante*, at 7, the protestor was not actually resisting arrest at all but simply standing still with his hands over his head and refusing to move away from the bridge. *Mitchell*, 28 F.4th at 898. In contrast, Locke repeatedly refused to release his arms and to cooperate with the officers' attempts to arrest him. Additionally, while the *Mitchell* officer deployed shotgun-propelled, lead-filled bean bags, Deputy Parks and Sheriff Aukes applied concentrated pressure to certain pressure points, pausing between applications to give Locke an opportunity to comply. While most anyone might have foreseen the severe eye injuries in *Mitchell*, the injuries here—facial paralysis, tinnitus, and emotional distress—were not so easily foreseeable. *See Webster v. Saint Louis Cnty.*, 135 F.4th 614, 618 (8th Cir. 2025) ("[T]he act of throwing [a

---

[4]Here, the defendants concede that Locke's resistance was merely passive, but in another case we might find that it was active. *See Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) ("Active resistance includes . . . refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance."); *United States v. Hollis*, 447 F.3d 1053, 1055 (8th Cir. 2006) (per curiam) (suggesting that a suspect is more than passively resisting when he flees, pulls away, or otherwise uses force to impede an arrest). Regardless, even if Locke's resistance was only passive, we have found that "[u]narmed, passively resisting subjects can pose a threat necessitating the use of taser force." *Kohorst v. Smith*, 968 F.3d 871, 878 (8th Cir. 2020); *see Carpenter v. Gage*, 686 F.3d 644, 649-50 (8th Cir. 2012) (finding officers could reasonably interpret suspect's actions as resistance when suspect was lying on his stomach with his hands underneath him); *Hosea v. City of St. Paul*, 867 F.3d 949, 958 (8th Cir. 2017) (finding passive resistance when suspect dropped to one knee instead of fully to the ground as he had been ordered); *Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018) (finding passive resistance when suspect failed to follow officers' commands when confused due to chaotic surroundings).

volleyball] is not so inherently dangerous that every reasonable officer should have anticipated that her action was likely to cause injury."). *Mitchell* is not analogous.

*Poemoceah* is yet less similar. In *Poemoceah* the plaintiff protestor alleged that dozens of officers—without informing the protestor that he was under arrest or commanding him to stop—charged him, causing him to flee in fear. 117 F.4th at 1053. After one officer "violently tackled" the protestor from behind, other officers "piled on top of him" and "further assaulted him," even "after he was already subdued." *Id.* (citations modified). After the protestor cried out in pain and told officers his hip was broken, the officers mocked him, accused him of "playing games," and forced him to walk at least two hundred feet to the police van. *Id.* at 1053-54. The protester alleged that he suffered a pelvic fracture, injuries to his neck, ankle, and left wrist, severe PTSD, anxiety, and depression. *Id.* at 1054. We found the protestor had successfully alleged a violation of his clearly established rights, especially emphasizing that the protestor was not under arrest and had been given no commands to stay in place or to stop moving. *Id.* at 1055. In contrast, Locke alleges neither that the officers failed to warn him, nor that they mocked him. He does not allege that the officers continued to apply force after he was arrested. He does not even allege that they continued to apply force after he complained of changes to his facial movements. *Poemoceah* is not analogous.

Not only are *Mitchell* and *Poemoceah* inapposite to the case at hand, but the court also glosses over applicable precedent that decides our inquiry. Take, for example, *Ehlers v. City of Rapid City*, where we considered the methods used to effect the arrest of a man who continued walking away after an officer ordered him to stop and to place his hands behind his back. 846 F.3d 1002, 1007 (8th Cir. 2017). The defendant officer executed a spin takedown and then—while three other officers held the arrestee down—used a taser to shock the arrestee. *Id.* at 1007-08. We granted qualified immunity to the officer regarding both his takedown and his use of the taser. *Id.* at 1011. Regarding the takedown, we reasoned that a reasonable officer would interpret the arrestee's initial behavior—walking away and ignoring orders— as "noncompliant." *Id.* Therefore, the officer was "entitled to use the force

-12-

necessary to effect the arrest," including the spin takedown procedure. *Id.* We further emphasized that the officer had provided two warnings before executing the takedown. *Id.* We also granted qualified immunity regarding the officer's use of the taser, because the officer "reasonably could have interpreted [the arrestee's] behavior of continuing to lay on his hands and refusing to comply with instructions as resistance and reasonably responded." *Id.* (citing *Carpenter*, 686 F.3d at 649-50 (granting qualified immunity to an officer who tasered an arrestee who was lying on his stomach with his hands under him and refusing to give his hands to officers despite orders to do so)).

The court distinguishes *Ehlers* because it involved "tense circumstances" leading up to the arrest. *Ante*, at 8 (pointing out that the arrestee's wife, children, and friend had been kicked out of an event and were arrested for swearing at staff and fighting with security personnel). Yet the *Ehlers* court did not mention those "tense circumstances" in its qualified immunity analysis. *See* 846 F.3d at 1011. Rather, the *Ehlers* court focused on the arrestee's argument that "no force was appropriate because he was being arrested for a nonviolent misdemeanor and was not resisting" arrest. *Id.* We found these factors inapplicable because the arrestee "at least appeared to be resisting." *Id.* Locke did not just "appear[] to be resisting," *see id.*, but *actually* was resisting. And while the *Ehlers* arrestee was only suspected of obstructing a police officer and resisting arrest, *id.* at 1008, Sheriff Aukes and Deputy Parks reasonably suspected Locke of four crimes, including a felony. *Ante*, at 3 n.1.

Altogether, our precedent does not support the court's finding that the officers violated a clearly established right. Locke alleges that, upon suspecting him of felony theft—a serious crime—and three other misdemeanors, two officers attempted to effect his arrest by using pain compliance techniques to force him to release himself from the sleeping dragon device. He does not allege that he ever lacked the ability to free himself and admits that sleeping dragon devices are usually removed with power tools. He does not allege that the officers used pain compliance techniques for any purpose other than to effect his arrest. He does not even allege

-13-

that the officers appeared to take pleasure in causing pain.  This does not constitute a violation of a clearly established right; therefore, the officers are entitled to qualified immunity.

Further, because they did not violate a clearly established right, the officers are also entitled to official immunity.  Minnesota law protects public officials from personal liability for discretionary actions taken pursuant to their official duties unless they are "guilty of a willful or malicious wrong." *Birkeland ex rel. Birkeland v. Jorgensen*, 971 F.3d 787, 792 (8th Cir. 2020).  "A discretionary act is committed with malice if the official has intentionally committed an act that he or she had reason to believe is prohibited." *Johnson v. City of Minneapolis*, 901 F.3d 963, 972 (8th Cir. 2018) (citation modified).  Here, as the right was not clearly established, the officers had no reason to know their actions were prohibited.  And, as the officers are entitled to official immunity, Hubbard County is entitled to vicarious official immunity.  *See Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998) (observing that vicarious official immunity protects a municipality from suit if its employee is entitled to official immunity).

Finally, the court reverses and remands the official capacity claim for reconsideration of whether Hubbard County was liable for Sheriff Aukes's actions.  The dismissal should be affirmed because Locke fails to adequately allege an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise that violated his constitutional rights.  *See Leftwich ex rel. Leftwich v. Cnty. of Dakota*, 9 F.4th 966, 972 (8th Cir. 2021).  The complaint merely states that Aukes serves as Sheriff for Hubbard County.  Without more context, this does not provide the defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *See Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008).

I respectfully dissent.

_____